**DIVERSIFIED EQUITIES, INC., a Utah corporation, and Dakal, Inc., a Utah corporation, Plaintiffs and Appellants,**

v.

**AMERICAN SAVINGS AND LOAN ASSOCIATION, et al., Defendant and Respondent.**

No. 860287–CA.

Court of Appeals of Utah.

July 22, 1987.

---

Jerome H. Mooney, Arthur M. Strong, Mooney & Smith, Salt Lake City, for plaintiffs and appellants.

Ted Boyer, H. Mifflin Williams III, Clyde, Pratt, Gibbs & Cahoon, Salt Lake City, for defendant and respondent.

Before ORME, JACKSON and BENCH, JJ.

## OPINION

ORME, Judge:

Appellants Diversified Equities, Inc. (Diversified) and Dakal, Inc. (Dakal) brought an action to quiet title to a duplex and lot in Salt Lake County. Respondent American Savings and Loan (American) had a recorded security interest in the property which was released prior to the conveyances to Diversified and Dakal. The lower court quieted title in Dakal, subject to an equitable lien in favor of American equal to the principal amount owing on the note secured by American's previous trust deed. Dakal seeks reversal of the lower court's judgment and an order that Dakal owns the property in fee simple, free of any interest in American. Diversified, which bought the property from Dakal, seeks reversal of the judgment below and an order upholding its rights against Dakal in the property. We reverse.

## FACTUAL BACKGROUND

So far as is relevant for this appeal, which concerns only the rights of Dakal/Diversified and American *inter se*, the dispute was submitted to the lower court on a detailed stipulation of facts read into the record by counsel. Although there are several transactions, the key facts are relatively simple.

On January 2, 1978, American loaned the Baileys $59,200, which was secured by a trust deed to the property in question. The trust deed was recorded in February 1978. The property was then sold in 1980 to Liston, then on May 14, 1982 by Liston to M & W Enterprises. Although M & W did not pay cash, Liston parted with title to the property. M & W's future obligations were not secured by the subject property but instead Liston was given a trust deed in other property, which proved to be worthless as security. M & W sold the subject property to Rydalch on May 28, 1982, as the first part of a contemplated exchange transaction. The property was

still subject to American's original trust deed, and the deed to Rydalch so recited, as did various closing papers.

In order to purchase the property from M & W, Rydalch borrowed $18,000 from Holzer, who took in return a note for $19,200. M & W's principal, Miller, promised to repay Holzer within 30 days. Instead, Miller skipped town. Rydalch then attempted to sell the property to raise the money to repay the note to Holzer and had his attorney, Burnett, investigate the liens on the property. Burnett learned from another financial institution that its trust deed of record had actually been discharged and he secured a reconveyance. Rydalch and Burnett then called American a total of three times and, while the first call was inconclusive, were told each of the other times that the loan to the Baileys had been repaid. Rydalch apparently chose not to be too curious about who his benefactor might be.

Prompted by the telephone calls, American executed and recorded a reconveyance in early December 1982. American subsequently discovered that the loan had not been paid and that there was a balance due in excess of $55,000. Apparently American erred because the Baileys had some thirty-four loans with American, and American's records were somewhat confused. The trial court concluded that American was negligent in reconveying the property.[1]

Meanwhile, Holzer began threatening Rydalch that he and his family would sustain bodily harm if the amount due him was not paid. Although Holzer had received a trust deed to the duplex property, he wanted cash. Rydalch then responded to an ad placed by Pentelute, a self-described mortgage broker specializing in distressed sales. Pentelute spoke to Rydalch, Rydalch's attorney Burnett, and American, and received confirmation all around that

American's trust deed had been satisfied. Pentelute was furnished a copy of the reconveyance. Pentelute then contacted Wayne Peck, a principal in both Dakal and Diversified, who agreed to purchase the property. Pentelute ordered a title search, which disclosed nothing unexpected except a lis pendens recorded in September 1982 on behalf of Liston. To facilitate the sale which would raise his repayment, on January 21, 1983, Holzer obtained a release of the lis pendens, albeit with a bad check, and the sale from Rydalch to Dakal was closed later that day.

Dakal paid $38,260 for the property and paid Pentelute a $14,000 finder's fee. Dakal immediately recorded its warranty deed and sold the property to Diversified for $60,000. A month later American, having discovered its mistake, recorded an affidavit stating that it had released the trust deed in error and that the trust deed was still in effect.

On these facts,[2] the trial court held that Diversified and Dakal were not bona fide purchasers of the property. It concluded that Pentelute and/or Wayne Peck had more than sufficient information to necessitate yet further inquiry into whether Rydalch or any one else had actually satisfied the obligation to American and whether American had made a mistake in releasing its trust deed on the property. The trial court cited the following facts as imposing upon Pentelute and Peck a duty of further inquiry: the reference to American's lien in Rydalch's deed; the sale of the property by Rydalch to Dakal for approximately one-half or less of its market value; the $14,000 finder's fee paid to Pentelute compared to the purchase price of some $38,000; and the same-day transfer of the property from Dakal to Diversified. The trial court quieted title in Dakal, subject to an equitable lien in favor of American.

---

1. The reconveyance gives every appearance of being the product of a deliberate—and deliberative—act. The "Full Reconveyance" was signed by one officer and attested by another. It recited that written instructions to reconvey had been received from the beneficiary and that the note secured by the trust deed had been presented for endorsement. It additionally recited that

the reconveyance was executed by authority of a resolution of American's board of directors.

2. Significantly, the stipulated facts include nothing inconsistent with the conclusion that the dealings of Rydalch and Dakal, through the broker Pentelute, were at arm's length.

The issue on appeal is whether there was sufficient notice of a "lien" on the property to require a duty of further inquiry by Dakal. If there was, Dakal was not a bona fide purchaser and took the property subject to American's "lien." [3]

### NOTICE REQUIREMENT

■ Under our recording statute, an unrecorded conveyance is "void as against any subsequent purchaser in good faith and for valuable consideration of the same real estate ... where his own conveyance shall be first duly recorded." Utah Code Ann. § 57–3–3 (1986). However, under Utah Code Ann. § 57–1–6 (1986), unrecorded documents affecting real property are enforceable as against persons with "actual notice." Thus, "[a] subsequent purchaser must ... show that he had no actual notice, i.e., no personal knowledge, of a prior conveyance or that the prior conveyance did not impart constructive notice, i.e., was not recorded before his conveyance in the same land was recorded." *Utah Farm Prod. Credit Ass'n. v. Wasatch Bank*, 734 P.2d 904, 906 n. 2 (Utah 1987). Wayne Peck and Pentelute obviously did not have constructive or record notice because American had mistakenly released its trust deed and recorded its reconveyance before they dealt with the property.

■ As for the "actual notice" exception of Utah Code Ann. § 57–1–6 (1986), the stipulated facts make clear Peck and Pentelute did not have actual knowledge of American's interest. However, the exception is also triggered if a party dealing with the land has information or facts which would put a prudent person upon an inquiry which, if pursued, would lead to actual knowledge as to the state of the title. *Johnson v. Bell*, 666 P.2d 308, 310 (Utah

1983). Whether a party should be charged with "actual notice," either in the sense of having actual knowledge or being on inquiry notice, turns on questions of fact. *See id.* The trial court "found" that Peck and Pentelute were chargeable with "actual notice."

### EFFECT OF STIPULATED FACTS

Generally, a trial court's findings of fact are accorded great deference. However, without regard to the labels used, when those "findings" proceed from stipulated facts, as in the instant case, the "findings" are tantamount to conclusions of law, with the stipulation of facts being the functional equivalent of true findings of fact. *See Stiles v. Brown*, 380 So.2d 792, 794 (Ala. 1980). *See also City of Spencer v. Hawkeye Security Ins. Co.*, 216 N.W.2d 406, 408 (Iowa 1974) ("Where the facts are not in material dispute, interpretation placed thereon by trial court becomes a question of law which is not conclusive on appeal."); *Schroeder v. Horack*, 592 S.W.2d 742, 744 (Mo.1979) (only issue on appeal was whether trial court drew the proper legal conclusions from the stipulated facts). On appeal, this court reviews conclusions of law for legal correctness. *Copper State Thrift & Loan v. Bruno*, 735 P.2d 387, 389 (Utah App.1987). *See Scharf v. BMG Corp.*, 700 P.2d 1068, 1070 (Utah 1985).

### CONCLUSION

■ After a careful review of the stipulated facts, we cannot agree with the lower court's conclusion of law that Pentelute and Peck (as opposed to Rydalch, who clearly knew better) had sufficient information to necessitate *further* inquiry into the status of American's trust deed.[4]

---

3. For purposes of this appeal, we employ the parties' logic that the legal effect of an improvidently recorded reconveyance is to leave the lien created by the trust deed in legal existence, albeit unrecorded. We are not asked to decide whether reconveyance has the legal effect of actually terminating the lien created by a trust deed and rendering the accompanying note, if it has not been repaid, unsecured.

4. The previously identified specific factors relied on by the court in support of its conclusion that Pentelute and Peck were not bona fide purchasers do not tilt toward that result. Reference in Rydalch's deed to American's interest was meaningless in the face of American's subsequent reconveyance. A distress sale well below market price can be prompted by numerous factors. Indeed, it was stated in the stipulation of facts that Rydalch would testify he agreed to sell so cheaply because he could not secure a

While the circumstances were suspicious and called for inquiry, Pentelute, acting for Peck, *inquired*—and with sufficient diligence to meet the duty imposed by the doctrine of inquiry notice. He had a title search performed and he *personally* contacted American even though the results of Rydalch's and Burnett's three prior contacts were accurately—if disingenuously—communicated to him and even though he had a copy of the reconveyance. American confirmed what the title search, the reconveyance, Burnett, and Rydalch all told him. Wayne Peck, acting for Dakal and Diversified, reasonably relied on the title search and the clear evidence, both documentary and verbal, of American's reconveyance.[5] American negligently released its trust deed, and its security interest will not be preserved against bona fide third party purchasers who, at least on the facts as stipulated, were bona fide purchasers without notice and without further duty to inquire. To hold otherwise would defeat the purpose of the recording statutes and subvert the sound commercial policy they promote.

We reverse and remand with instructions to quiet title to Dakal and/or Diversified, as their interests may appear, as against American. Each party shall bear its own costs of appeal.

JACKSON and BENCH, JJ., concur.

---

loan since the duplex was not owner-occupied and because of the lis pendens against the property. In addition, it was actually stipulated that Rydalch was under extreme pressure because of Holzer's threats of violence and because of the imminency of a trustee's sale noticed by Holzer. A hefty finder's fee is to be expected where a free-lance broker finds a property which can be had for a comparative song. A same-day transfer from one related entity to another might be effected for a number of tax or business reasons. In this case, Diversified was a group of investors put together by Peck but who, unlike Peck, apparently had no interest in Dakal. The back-to-back sales left the Diversified shareholders with a property worth more than they had to pay for it, while netting Dakal, in which Peck apparently had a greater interest, $8,000.00 profit.

5. A duty of inquiry requires the party to make inquiry and to diligently do that which the answer to the inquiry reasonably prompts. Pentelute's inquiry elicited an answer which was consistent with the reconveyance document he had seen, the title report, and Rydalch's and Burnett's reports about what they were told. It would stretch the notion of inquiry notice beyond the breaking point to hold that the answer Pentelute received to his inquiry of American should have prompted him to go further. What would he have done? Demand to see receipts, instructions for reconveyance from the beneficiary to the trustee, or the chairman of American's board? He obviously had some concern or, with a reconveyance regular on its face in hand, there would be no reason to call American for verbal confirmation of the fact of reconveyance. But a duty to inquire is not a duty to disbelieve, aggressively investigate, and set straight. *See also* Note 1, *supra.*