**DOVER ELEVATOR COMPANY,
Plaintiff and Respondent,**

v.

**HILL MANGUM INVESTMENTS, Russell W. Mangum, Brent C. Hill, and Garden Towers Condo–Owners Corporation, Defendants and Appellant.**

No. 870130–CA.

Court of Appeals of Utah.

Dec. 9, 1988.

Bruce E. Coke, Steven H. Lybbert, Beaslin, Nygaard, Coke & Vincent, Salt Lake City, for defendants and appellant.

John D. Parken, Parken & Keck, Salt Lake City, for plaintiff and respondent.

Before BENCH, GARFF and ORME, JJ.

## OPINION

ORME, Judge:

Respondent Dover Elevator Company ("Dover") brought an action against Hill Mangum Investments ("Hill–Mangum") and appellant Garden Towers Condo–Owners Corporation ("the Corporation"). Dover sought to recover the outstanding balance owed on an elevator maintenance contract. A district court judge granted Dover's motion for summary judgment on the same day his resignation became effective. His replacement entered judgment for Dover without entering findings of fact or conclusions of law. The Corporation contends that it was error for the court not to file findings and conclusions and, alternatively, that the district court erred in granting judgment to Dover in the first instance. We are persuaded by the latter argument and reverse.

## FACTS

This case arises from an unsuccessful condominium development.[1] In late 1979 or early 1980, Hill–Mangum, a partnership, began construction of a multistory condominium project known as Garden Towers. In August 1980, Hill–Mangum entered into a construction contract with Dover to install two elevators at Garden Towers. The contract, which listed "Hill–Mangum, Inc."[2] as the purchaser and Dover as the seller, was signed on behalf of Hill–Mangum by Gary Lawrence, "project manager."

The Garden Towers Condominium Owners Association ("the Owners Association") was formed upon recordation by Hill–Mangum of a condominium declaration pursuant to Utah Code Ann. § 57-8-10 (1986). The declaration was recorded December 15, 1981.[3]

On March 1, 1982, Hill–Mangum entered into an elevator maintenance agreement with Dover and this contract was also signed by Gary Lawrence, as "project manager," on behalf of "Hill–Mangum, Inc." Hill–Mangum had apparently been unable to sell any of its condominiums at the time the maintenance agreement was signed and still owned all of the condominium units in the project.

Hill–Mangum paid the monthly maintenance charges due Dover, albeit not always in a timely manner, until its financial difficulties became insurmountable. The elevator maintenance contract was eventually cancelled by Dover, effective January 23, 1984, for nonpayment of several outstanding invoices.

Hill–Mangum arranged for a new elevator maintenance agreement with Wasatch Elevator on January 27, 1984. This agreement specified that the Owners Association was the "purchaser" and was signed by Ned R. Fox, an employee of Hill–Mangum, on behalf of the Owners Association.

Meanwhile, in December 1983, Hill–Mangum, which had by then sold some units, contacted the Garden Towers unit owners and suggested they hold an owners' meeting to elect officers and take over the operation of the Owners Association. The unit owners declined to accept control and management until a number of unfinished items were completed and an accounting provided. Hill–Mangum did not provide the requested accounting and no meetings were held to discuss the issues.

Hill–Mangum was unable to complete the project, leaving many items unfinished or in disrepair. Electric power to the building was subsequently terminated, and the unit owners determined that they would have to assume responsibility for the building's operation. On September 1, 1984, the unit owners met to form the Corporation. Officers and directors were elected and the Corporation undertook the management of the common areas of the building.

On October 15, 1984, the Corporation entered into a new elevator maintenance contract with Wasatch Elevator which expressly replaced the earlier contract between Wasatch Elevator and the Owners Association. The officers of the Corporation were unaware of the previous maintenance contract with Dover until the Corporation was named as a defendant in this action.

To permit efficient resolution of the matter, counsel for the parties filed a comprehensive stipulation of facts with the trial court. The parties presented their arguments before Judge Philip R. Fishler shortly before he resigned. The court took the matter under advisement and on July 31,

---

1. The facts are principally derived from the stipulated facts filed with the district court.

2. The use of "Inc." was an error which occurred throughout Hill–Mangum's dealings with Dover. No such corporation existed. At all times the partnership has been known as Hill Mangum Investments.

3. A complete copy of the declaration can be found in the addendum to respondent's brief, along with a legible copy of all other relevant documents and pleadings in chronological order. Such an addendum is an excellent example of how conformity with R.Utah Ct.App. 24 can assist this court in efficiently deciding matters before it.

1986, his last day on the bench, Judge Fishler signed a minute order granting judgment in favor of Dover. Dover then submitted proposed findings of fact and conclusions of law to the presiding judge, who deferred the matter for consideration by Judge Fishler's replacement.

In October 1986, the matter was presented to Judge Michael R. Murphy, who had recently been appointed to replace Judge Fishler. The Corporation objected to the proposed findings of fact and conclusions of law. Judge Murphy denied the Corporation's objections but ruled that the findings of fact and conclusions of law would remain unsigned and that judgment would be entered in Dover's favor on the basis of Judge Fishler's signed minute entry.

Dover prepared another proposed judgment which the Corporation also objected to because it awarded Dover attorney fees which the Corporation claimed were unsupported by the stipulated facts. After negotiations between the parties' counsel, a sum for attorney fees was agreed upon and a third judgment was prepared, approved as to form, and entered by Judge Murphy on December 16, 1986. The Corporation appeals from that judgment.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

■ The Corporation contends that Judge Murphy committed reversible error by refusing to file findings of fact and conclusions of law. Normally, failure to comply with Utah R.Civ.P. 52(a) would constitute reversible error.[4] *See, e.g., Parks v. Zions First Nat'l Bank*, 673 P.2d 590, 601 (Utah 1983). The rule serves two important purposes. First, findings of fact function to inform the parties about the "mind

of the court" and the analysis the court used to resolve the dispute. *Id.* As the Supreme Court stated in *LeGrand Johnson Corp. v. Peterson*, 18 Utah 2d 260, 420 P.2d 615 (Utah 1966), "[t]he right to resort to the courts for the adjudication of grievances and the settlement of disputes is a fundamental and important one. An indispensable requisite to fulfilling that responsibility is the determination of questions of fact upon which there is disagreement." 420 P.2d at 616. Secondly, findings of fact provide a basis on which an appellate court can review the judgment. *Bastian v. King*, 661 P.2d 953, 957 (Utah 1983) ("Proper findings are essential to enable this Court to perform its functions of assuring that the findings support the judgment and that the evidence supports the findings.").

The present case, however, is one where the facts are stipulated and therefore undisputed. Such stipulated facts are themselves "the functional equivalent" of findings of fact. *Diversified Equities, Inc. v. American Sav. & Loan Ass'n*, 739 P.2d 1133, 1136 (Utah Ct.App.1987). Moreover, since the stipulated facts are written and do not turn on witness credibility, an appellate court has "the same means as the trial court had of reaching a correct conclusion of law." *Stiles v. Brown*, 380 So.2d 792, 794 (Ala.1980). In short, judicial findings of fact would have added nothing in this case since the facts had already been "found" by the parties and were set forth in their stipulation.

■ Similarly, it was not reversible error for the trial court to omit making formal conclusions of law. The trial court's failure to fully comply with Utah R.Civ.P. 52(a) and articulate conclusions of law, although perhaps technically incorrect,[5] does not amount to prejudicial error and there-

---

4. Utah R.Civ.P. 52(a) provides: "In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon...." Findings and conclusions are ordinarily not required where a case is resolved on motion. *See id.* In substance, if not in form, this case was submitted for resolution on cross-motions for summary judgment, with the

stipulation of facts taking the place of affidavits. In this sense, findings and conclusions were not required at all, although a "brief written statement of the ground" for the court's disposition would have been appropriate. *See id.*

5. *But see* Note 4, *supra.*

fore does not require reversal. This court is able to scrutinize the stipulated facts and make its own determination as to the proper conclusions of law which they dictate. *See, e.g., Western Kane County Special Serv. Dist. v. Jackson Cattle Co.*, 744 P.2d 1376, 1378 (Utah 1987) ("conclusions of law are simply reviewed for correctness without any special deference"); *Czap v. Czap*, 269 Wis. 557, 69 N.W.2d 488, 489 (1955) (where stipulation provided all that was needed to support judgment, alleged failure of trial court to make findings of fact and conclusions of law did not require reversal).

As we see no procedural error which requires reversal, we turn to the merits of the appeal.

## LEGAL IDENTITY OF CORPORATION AND OWNERS ASSOCIATION

█ Dover's theory for imposing liability on the Corporation runs something like this: In entering into the maintenance agreement with Dover, Hill–Mangum was not acting for itself, but as the Owners Association's board of directors. Thus, the Owners Association is liable on the agreement. Since the Owners Association is legally indistinguishable from the Corporation, it follows that the Corporation is liable to Dover on the maintenance agreement.

We have some difficulty with the latter proposition. The Owners Association was created by declaration recorded pursuant to the Condominium Ownership Act.[6] The declaration created the Owners Association as "an unincorporated association ... of which all of the Unit Owners are members." *See also* Utah Code Ann. § 57–8–3(1) (1988). The act specifically requires that the declaration state "[t]he method by which the declaration may be amended." Utah Code Ann. § 57–8–10(2)(i) (1986). The declaration in this case requires that any amendment must be made upon the approval of a majority of the unit owners and, consistent with the act, that

any such amendment be recorded. *See id.* § 57–8–12(1) ("Neither the declaration nor any amendment thereof shall be valid unless recorded."). Although the Corporation was apparently incorporated with the express purpose of performing the functions of the Owners Association, the record does not establish that the procedures legally mandated to effectively amend the declaration, and thereby substitute the Corporation for the "unincorporated association," were followed.

Moreover, the Corporation was not formed until several months after the cancellation of the elevator maintenance contract, and the Corporation had no knowledge of either the contract between Dover and Hill–Mangum or the outstanding invoices. Upon its formation, the Corporation entered into its own contract with Wasatch Elevator, learning for the first time of Dover's earlier involvement when served with process in the present action.

The stipulated facts simply do not reveal whether creation of the Corporation was a deliberately-contrived, "thinly-veiled attempt to avoid the prior obligations of the Owners Association," as argued by Dover, or whether the unit owners successfully established the Corporation as a distinct legal entity insulated from liabilities predating its existence. However, we need not resolve this aspect of the dispute. Even if it is assumed that the Corporation is liable for the debts of the Owners Association, judgment against the Corporation was nonetheless improper since the stipulated facts do not establish that the charges due under the maintenance agreement were the responsibility of the Owners Association.

## REPRESENTATIVE CAPACITY

The Garden Towers Condominium Declaration provides that the Owners Association board of directors "shall consist of the declarant," i.e., Hill–Mangum, until the

---

6. *See* Utah Code Ann. § 57–8–3(13) (1988); *id.* § 57–8–10 (1986). Utah Code Ann. §§ 57–8–1 to 57–8–36 are collectively referred to as the "Condominium Ownership Act."

first organizational meeting of the Owners Association. *See* Utah Code Ann. § 57–8–16.5(1) (1986). The declaration further provides that "[t]he business, property and affairs of the Project shall be managed, operated and maintained by the Board" and that the board shall have "[t]he authority to enter into contracts which in any way concern the Project."

Dover asserts that the maintenance agreement "was entered into, under Utah law, by the Board of Directors of the owners association." While there is no question that under the provisions just described Hill–Mangum had the requisite *power* to sign the elevator maintenance agreement with Dover in its capacity as acting board of directors, and thereby bind the Owners Association to its terms, it does not follow that it actually did so.

To support its proposition, Dover seems to rely primarily on this fact: "On March 1, 1982, a further agreement dealing with maintenance of the elevator to be installed was executed and also subscribed by Gary Lawrence on behalf of Hill–Mangum, Inc." This fact fails to support Dover's contention that Hill–Mangum executed the maintenance agreement as the acting board of directors of the Owners Association. Instead, it simply shows that Gary Lawrence, as an agent for Hill–Mangum, signed the contract on behalf of Hill–Mangum.

Examination of the contract document also fails to establish that Hill–Mangum signed it in any capacity other than on its own behalf. The contract was accepted by Hill–Mangum and signed on its behalf by Gary Lawrence, project manager. It was not signed on behalf of the Owners Association by Hill–Mangum, its acting board of directors. Moreover, at the time the agreement was signed, no representation was made to Dover that Hill–Mangum was acting as the board of directors of the Owners Association. Hill–Mangum signed the contract without indicating that it was doing so as an agent acting for a principal or in any capacity other than for itself. This bound Hill–Mangum to the agreement.

*See, e.g., Anderson v. Gardner,* 647 P.2d 3, 4 (Utah 1982); *Mortgage Inv. Co. v. Toone,* 17 Utah 2d 152, 406 P.2d 30, 31 (1965).

Although Hill–Mangum's liability does not necessarily foreclose the possibility that "another person who does not sign the [contract] may not also be liable for the obligation which underlies it," *Myers v. Morgan,* 626 P.2d 410, 411 (Utah 1981), nothing in the stipulated facts supports a conclusion that the Owners Association is also liable. On the contrary, even if the maintenance agreement had been executed by Hill–Mangum "by or on behalf of the unit owners association," it would not be binding after the termination of Hill–Mangum's status as the acting board, "unless then renewed or ratified by the consent of unit owners of units to which a majority of the votes in the unit owners' association appertains." Utah Code Ann. § 57–8–16.5(2) (1986). *See also id.* § 57–8–16.5(4). Such ratification did not occur.

## CONCLUSION

We hold that Hill–Mangum did not sign the elevator maintenance agreement in a representative capacity as the board of directors of the Owners Association and therefore did not bind the Owners Association, much less the Corporation, to the agreement with Dover. The trial court's judgment against the Corporation, in its entirety, is accordingly reversed.

BENCH and GARFF, JJ., concur.