Lynda C. BALDWIN, Plaintiff
and Appellee,

and

Paul H. Richins, Substitute Appellee,

v.

Max D. BURTON, Sr.; Emily A. Burton;
Max D. Burton, Jr.; Willard D. Wood;
Tonya Glazier Wood; N.D. "Pete" Hayward, Sheriff of Salt Lake County,
Utah; and Keith L. Buckner, Deputy
Sheriff of Salt Lake County, Utah, Defendants and Appellants.

No. 900339.

Supreme Court of Utah.

Feb. 19, 1993.

Rehearing Denied March 24, 1993.

David H. Schwobe, Salt Lake City, for Burtons.

Paul H. Richins, pro se.

HALL, Chief Justice:

Defendants Max D. Burton, Sr., Emily A. Burton, and Max D. Burton, Jr., appeal from a summary judgment entered in favor of plaintiff Lynda C. Baldwin. We affirm.

In considering an appeal from summary judgment, we view the facts in a light most favorable to the nonmoving party.[1] We recite the facts accordingly.

On December 19, 1979, Ralph L. and Elaine L. Kofoed executed a warranty deed in favor of Willard D. Wood and Tonya Glazier Wood, thereby conveying the Kofoeds' interest in the property in question. The deed was recorded on December 19, 1979. On May 1, 1980, Willard Wood executed a warranty deed to the same property in favor of Tonya Wood. That deed was recorded on May 28, 1980.

On June 9, 1981, Max D. Burton, Sr., and Emily A. Burton obtained a judgment against Willard Wood and another person in an action brought to recover money due from a prior transaction.[2]

On September 30, 1981, Tonya Wood executed a trust deed in favor of the Kofoeds as trustor and beneficiary in consideration of the Kofoeds' remaining equity in the property. That deed was signed by both Tonya and Willard Wood and was recorded on October 2, 1981. On that same date, Tonya Wood conveyed the property by warranty deed to Gregory and Lynda Baldwin. That deed, signed by both Tonya and Willard Wood, was also recorded on October 2, 1981. The Baldwins therefore took the property subject to the underlying mortgage, the Kofoeds' trust deed, and any liens of record. At the time of the conveyance to the Baldwins, Tonya Wood was the

---

1. *Blue Cross & Blue Shield of Utah v. State,* 779 P.2d 634, 636 (Utah 1989).

2. Prior to 1980, Max Burton, Sr., Willard Wood, and Clealon B. Mann were partners in Woodcove Subdivision. In 1980, Wood and Mann agreed to purchase Burton's interest in the project. Wood and Mann executed a promissory note in favor of Max Burton, Sr., and Emily

Burton in the amount of $35,000. On February 25, 1981, the Burtons brought suit against Wood and Mann to recover the balance due under the promissory note. Summary judgment was entered in favor of the Burtons in the amount of $38,500. Sometime during September 1986, Max Burton, Sr., assigned his interest in the judgment against Wood to Max Burton, Jr.

only record owner of the property in question, and there were no liens of record against her.

On December 21, 1982, Gregory Baldwin quitclaimed his interest in the property to Lynda Baldwin. That deed was recorded on December 31, 1982.

On April 21, 1983, the Woods filed a petition for voluntary bankruptcy. The Burtons were listed as creditors of Willard Wood in the bankruptcy proceeding. The Woods' debts were discharged in bankruptcy in December 1983.

The property in question was scheduled for foreclosure in September 1986 under the Kofoeds' trust deed. The foreclosure report prepared by Surety Title Company indicated that the Burton judgment lien against Willard Wood had attached to the property, owned by Lynda Baldwin at the time, behind the first mortgage of Equitable Life Assurance Company and ahead of the September 30, 1981 trust deed from Tonya Wood to the Kofoeds.

On August 6, 1986, the Burtons obtained a writ of execution authorizing the Salt Lake County Sheriff to levy upon and sell enough of Willard Wood's unexempt property to satisfy the Burtons' judgment against him. About the same time, the Burtons delivered a praecipe directing the sheriff to "levy on the right, title and interest of Gregory Baldwin and Lynda Baldwin, successors in interest to Willard D. Wood." [3]

On August 11, 1986, the sheriff's office issued a notice of real estate levy. Under that notice, the sheriff levied upon all the "right, title, claim and interest of Gregory Baldwin and Lynda Baldwin, successors in interest to Willard D. Wood." The notice of real estate levy was recorded on August 12, 1986. The sheriff's office also issued a notice of real estate sale, indicating that all "right, title and interest of Gregory Baldwin and Lynda Baldwin, successors in interest to Willard D. Wood," were to be sold on September 9, 1986. On August 15, 1986, the sheriff published notice of the real estate sale of the Baldwins' interest in the property.

On September 9, 1986, the sheriff conducted an execution sale whereby the property was sold to the Burtons for $8,760. A certificate of sale-execution was subsequently issued indicating that all "right, title and interest of Gregory Baldwin and Lynda Baldwin, successors in interest of Willard D. Wood," had been sold to satisfy the judgment the Burtons had against Willard Wood. On May 7, 1987, the sheriff's office conveyed the Baldwins' interest in the property to the Burtons.

On June 10, 1987, at the foreclosure under the Kofoed trust deed, the property was sold at a trustee's sale to Robert L. Rice. Rice received a trustee's deed, which was recorded on June 18, 1987. On that same date, Rice executed a warranty deed for the property in favor of Derald A. Twilley. The warranty deed was also recorded on June 18, 1987. Twilley then conveyed the property by quitclaim deed to Lynda Baldwin. The quitclaim deed was recorded on October 8, 1987. Lynda Baldwin subsequently conveyed the property by quitclaim deed to the Lynda C. Baldwin Trust. That deed was recorded on June 23, 1988.

On behalf of the Lynda C. Baldwin Trust, Lynda Baldwin commenced this action against the Burtons to set aside the sheriff's deed on the basis that execution on the property was improper because Willard Wood, the Burtons' judgment debtor, had no interest in the property at the time the Burtons' judgment was docketed. Additionally, Baldwin sought to quiet title in the property and to have the trial court declare that the conveyance from Willard Wood to his wife was valid as to the Baldwins and that the Baldwins took the property from Tonya Wood as bona fide purchasers.

Both parties moved for summary judgment. The trial court granted Baldwin's motion, denied the Burtons' motion, and

---

**3.** While the original writ of execution directed the sheriff to levy upon and sell unexempt real property of Willard Wood only, in every subsequent document, the Burtons also included "Gregory Baldwin and Lynda Baldwin, as successors in interest of Willard D. Wood."

declared void both the sheriff's sale at which the property was sold to the Burtons and the sheriff's deed conveying the property. The trial court also found that when Max Burton, Sr., obtained his judgment against Willard Wood, Wood had no interest in the property to which a judgment lien could attach. The trial court held that it was necessary for the Burtons to bring a separate action to set aside the allegedly fraudulent conveyance and that the statute of limitations for that action had run.[4] In a subsequent order, the trial court awarded Baldwin $7,872.66 for attorney fees and related damages. The Burtons appeal from these rulings.

The primary issues presented on appeal are whether (1) a separate, prior action must be filed to set aside a fraudulent conveyance in a suit to foreclose and execute on a lien; (2) the statute of limitations bars an action by the Burtons to set aside the fraudulent conveyance; (3) the Baldwins were bona fide purchasers when they took the property from Tonya Wood; and (4) the trial court's award of attorney fees was reasonable.

We begin by noting the applicable standard of review. Summary judgment is proper when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[5] When reviewing an order granting summary judgment, we view the facts and all reasonable inferences that can be drawn therefrom in a light most favorable to the party opposing the motion.[6] The legal conclusions of the trial court are not accorded deference, but are reviewed instead for correctness.[7]

## SEPARATE ACTION FOR FRAUDULENT CONVEYANCE

The Burtons contend that before foreclosing and executing on a lien, it is not necessary to file a separate action to set aside a fraudulent conveyance. They base their argument on two points: First, they contend that the conveyance from Willard Wood to his wife was fraudulent because he was attempting to protect the property from creditors. The Burtons claim that because the conveyance was fraudulent, it was therefore void and Willard Wood still maintained an interest in the property. Because Wood maintained an interest in the property, the lien could attach, and it was therefore proper to execute on the property without having the conveyance set aside as fraudulent. In the alternative, the Burtons argue that because the conveyance was fraudulent, the Burtons could entirely disregard it and execute upon the property.

■ The Burtons maintain that according to Utah Code Ann. § 78–22–1,[8] the judgment obtained against Willard Wood in 1981 attached as a lien to the property. At issue is whether Willard Wood, the judgment debtor, had an interest in the property in question at the time the Burtons obtained their judgment against him. In order to make this determination, we must address the question of whether the 1980 conveyance from Willard Wood to his wife was void or simply voidable.

The Burtons assert that the Utah Fraudulent Conveyances Act ("the Act") explicitly states that a fraudulent conveyance is void. To support this position, they rely on section 25–1–8 of the Act,[9] which provides:

4. Subsequent to the trial court's granting of Baldwin's motion for summary judgment, the Burtons retained their present counsel for the purpose of contesting the trial court's decision on that motion.

5. Utah R.Civ.P. 56(c); *see Clover v. Snowbird Ski Resort*, 808 P.2d 1037, 1039 (Utah 1991); *Utah State Coalition of Senior Citizens v. Utah Power & Light Co.*, 776 P.2d 632, 634 (Utah 1989).

6. *Culp Constr. Co. v. Buildmart Mall*, 795 P.2d 650, 651 (Utah 1990).

7. *Pratt v. Mitchell Hollow Irr. Co.*, 813 P.2d 1169, 1171 (Utah 1991); *Landes v. Capital City Bank*, 795 P.2d 1127, 1129 (Utah 1990).

8. Utah Code Ann. § 78–22–1 states, "From the time the judgment of the district court or circuit court is docketed ... it becomes a lien upon all the real property of the judgment debtor...."

9. *Compare* Utah Code Ann. §§ 25–1–1 to –16 (1953) (repealed 1988) *with* Uniform Fraudulent Transfer Act, Utah Code Ann. §§ 25–6–1 to –13 (1988). Because the conveyance in question took place in 1980, the Utah Fraudulent Convey-

*Every conveyance or assignment,* in writing or otherwise, of any estate or interest in lands, or in goods or things in action, or of rents or profits issuing therefrom, and every charge upon lands, goods or things in action or upon the rents or profits thereof, *made with the intent to delay, hinder or defraud creditors,* or other persons, of their lawful suits, damages, forfeitures, debts or demands, and every bond or other evidence of debt given, suits commenced, or decree or judgment suffered, with the like intent, *as against the person hindered, delayed or defrauded shall be void.*[10]

Section 25–1–8 does invalidate conveyances made with intent to defraud. However, such conveyances are not automatically void. Under well-established law, a number of cases have held "void" to mean "voidable" only.[11] Professor Williston, in his work on contracts, stated:

> [A] statute may and sometimes does make a bargain absolutely void, but even though a statute states it in terms, "void" has been held to mean "voidable."
>
> . . .
>
> . . . .
>
> Unless no other conclusion is possible from the words of a statute it should not be held to make agreements contravening it totally void.[12]

In *Wagner v. United States,*[13] the United States Court of Appeals for the Seventh Circuit held that an assignment under Indiana law, although not in compliance with a statute, was voidable, not void. The

Wagner court stated, "[E]ven when [an assignment] is statutorily described as being 'void,' the proper construction is that the action is 'voidable at the option of one of the parties or some one [sic] legally interested therein.' "[14] *Wagner* stated the general rule of construction that when an act is void as to persons who have an interest in impeaching it, the act is not utterly void, but merely voidable.[15]

Utah cases adhere to the general rule expressed above. This court has stated that "a contract induced by fraud, false representations, mistake, etc., is not void but only voidable, and it is entirely within the right of the injured party to affirm it or treat it as valid and subsisting."[16] This court has also specifically addressed section 25–1–8 of the Act.[17] With regard to that section, we stated, "The remedy provided by the Act for a fraudulent conveyance is the voiding of the conveyance."[18] These cases clearly show that some action must be taken by the complaining party to render a conveyance void.

Two cases from other jurisdictions with facts similar to this appeal specifically address the issue of "void" versus "voidable." In *Becker v. Becker,*[19] a creditor brought suit to set aside a transfer made by the debtor to himself and his wife. The creditor claimed that the transfer was made fraudulently to hinder the plaintiff's ability to recover on the defendant's debt owed to her. While the threshold issue in *Becker* was whether the transfer itself was fraudulent, the *Becker* court also stated:

---

ance Act was still in effect and therefore governs this case.

**10.** Utah Code Ann. § 25–1–8 (1953) (repealed 1988) (emphasis added).

**11.** *See Harris v. Runnels,* 53 U.S. (12 How.) 79, 84–85, 13 L.Ed. 901 (1851) (qualifications of general rule); *Ewell v. Daggs,* 108 U.S. 143, 149, 2 S.Ct. 408, 412, 27 L.Ed. 682 (1883); *Fisher v. Thumlert,* 194 Wash. 70, 76 P.2d 1018, 1020 (1938).

**12.** 14 Samuel Williston, *A Treatise on the Law of Contracts* § 1630A (3d ed. 1972) (citations omitted).

**13.** 573 F.2d 447 (7th Cir.1978).

**14.** *Wagner,* 573 F.2d at 451–52 (quoting *Doney v. Laughlin,* 50 Ind.App. 38, 94 N.E. 1027, 1028 (1911)).

**15.** *Wagner,* 573 F.2d at 452 (citing *Mutual Benefit Life Ins. Co. v. Winne,* 20 Mont. 20, 49 P. 446, 449 (1897) (discussing general rule of construction for "void" and "voidable")).

**16.** *Frailey v. McGarry,* 116 Utah 504, 211 P.2d 840, 845 (1949).

**17.** *See Butler v. Wilkinson,* 740 P.2d 1244 (Utah 1987).

**18.** *Id.* at 1262.

**19.** 138 Vt. 372, 416 A.2d 156 (1980).

"A voluntary or a fraudulent conveyance is valid between the parties, and in fact as to the whole world, except those within the protection of the statute; thus the words 'null' and 'void' are construed to mean voidable only. Therefore such conveyances vest the legal title in the grantee, subject only to be divested by the creditors of the grantor if they choose to impeach it." [20]

In *Gurley v. Blue Rents, Inc.*,[21] a creditor brought suit to set aside an allegedly fraudulent conveyance wherein a debtor husband conveyed to his wife his interest in real estate held by the two as joint tenants. Pertinent to the issue now before this court, *Gurley* concluded that as to the grantor's creditors, "the conveyance is voidable [as opposed to void] and may be set aside at their option." [22]

The Burtons rely on a line of cases from this court to support their claim that the conveyance at issue is void.[23] These cases are easily distinguishable because they involved either a prior proceeding where a conveyance was adjudged fraudulent and void or a situation where a motion to declare a conveyance fraudulent had been denied.[24] Therefore, in all of those cases, one of the issues was whether the conveyance was actually fraudulent. In the instant case, the conveyance has not been declared fraudulent or void. Furthermore, whether the conveyance was fraudulent is not an issue before this court.

Hence, although section 25–1–8 of the Act uses the language "void," as opposed to voidable, we do not believe that such a strict interpretation is warranted by the applicable case law. The conveyance is not the type of act that is routinely null, but rather, it must be challenged or set aside to render it void. Moreover, the conveyance is not something of which all the world may take advantage, but only the Burtons, who claim that they were injured by the transfer. Because the conveyance from Willard Wood to his wife has not been adjudged void as a fraudulent conveyance, we conclude that it is voidable but not void.

■ We next address the Burtons' argument that because the conveyance was fraudulent, the Burtons could, pursuant to Utah Code Ann. § 25–1–15, entirely disregard it and execute upon the property.[25] Again, the Burtons claim that the conveyance was fraudulent because Willard Wood was attempting to shield the property from his creditors. While there is some record evidence suggesting that Willard Wood conveyed the property to his wife to protect it from creditors, we find little merit in this argument. A transfer must first be held void as fraudulent before section 25–1–15 becomes operative.[26] Although it remains in dispute, even if Willard Wood did admit fraud, the conveyance has not yet been adjudged fraudulent, and therefore,

**20.** *Id.,* 416 A.2d at 162 (quoting *Jones v. Williams,* 94 Vt. 175, 109 A. 803, 807 (1920)).

**21.** 383 So.2d 531 (Ala.1980).

**22.** *Id.* at 536 (citing *Brown v. Andrews,* 288 Ala. 111, 257 So.2d 356, 359 (1972)); *see also First Nat'l Bank of Birmingham v. Love,* 232 Ala. 327, 167 So. 703 (1936).

**23.** *See Meyer v. General American Corp.,* 569 P.2d 1094 (Utah 1977); *Jensen v. Eames,* 30 Utah 2d 423, 519 P.2d 236 (1974); *Cardon v. Harper,* 106 Utah 560, 151 P.2d 99 (1944); *W.P. Noble Mercantile Co. v. Mt. Pleasant Equitable Co-Operative Inst.,* 12 Utah 213, 42 P. 869 (1894).

**24.** *Meyer,* 569 P.2d at 1095 (trial court held sale void for failure of fair consideration and lack of good faith); *Jensen,* 519 P.2d at 237 (plaintiff urged trial court to find transfer of stock fraudulent conveyance under Utah Code Ann. §§ 25–

1–1 to –16); *Cardon,* 151 P.2d at 100 (appeal from decree adjudging conveyance of land fraudulent); *W.P. Noble Mercantile Co.,* 42 P. at 870 (plaintiff sought to declare assignment of real estate null and void).

**25.** Section 25–1–15 (1953) (repealed 1988) states in relevant part:

Where a conveyance or obligation is fraudulent as to a creditor, such creditor, when his claim has matured, may as against any person, except a purchaser for fair consideration without knowledge of the fraud at the time of the purchase or one who has derived title immediately or mediately from such a purchaser:

...;

(2) Disregard the conveyance, and attach, or levy execution upon, the property conveyed.

**26.** *See Butler,* 740 P.2d at 1262 n. 13.

the remedy under section 25–1–15 is not available.

Furthermore, the Burtons cannot execute under section 25–1–15(2) because the property is not in the hands of the allegedly fraudulent transferee.[27] When the Burtons executed on the property, the land was no longer in the hands of Tonya Wood, the allegedly fraudulent transferee, but was owned by Baldwin. Because the conveyance has not been declared fraudulent and is not in the hands of the fraudulent transferee, section 25–1–15 does not apply.

In sum, since the conveyance is not void, but merely voidable, the Burtons could not simply disregard it and execute on the property. Contrary to the Burtons' position, Willard Wood held no interest in the property at the time the Burtons obtained their judgment against him; hence, a lien did not attach and the Burtons could not execute on the property.[28] We therefore conclude, as did the trial court, that it was necessary for the Burtons to bring a prior, separate action to set aside and declare void the allegedly fraudulent conveyance before foreclosing and executing on Baldwin's interest in the property.[29]

## STATUTE OF LIMITATIONS

■ The trial court concluded that the Burtons did not bring a separate action to set the conveyance aside or assert fraud anywhere in their pleadings. As a result, it held that the statute of limitations had run on bringing an action for a fraudulent conveyance and, therefore, as a matter of law, Willard Wood had no ownership interest in the property in question. The Burtons challenge the trial court's conclusion.

The applicable period of limitations is found in Utah Code Ann. § 78–12–26(3), which states in relevant part:

Within three years:

. . . .

(3) An action for relief on the ground of fraud or mistake; except that the cause of action in such case does not accrue until the discovery by the aggrieved party of the facts constituting the fraud or mistake.

We first determine when the three-year period of limitations began to accrue. In cases such as this, equity requires that the statute of limitations for fraud does not begin to run until the fraud is discovered by the injured party.[30] Baldwin argues that the Burtons were on constructive notice of the allegedly fraudulent conveyance and that the three-year period began to run on any one of three different dates: in May 1980, when the deed from Willard Wood to his wife was recorded; in June 1981, when Max Burton, Sr., obtained the judgment against Willard Wood; or in September 1981, when the deed from Tonya Wood to the Baldwins was recorded. The Burtons contend that constructive knowledge of a transfer or the recording of a deed itself is not enough to constitute notice of fraud. They rely on *Smith v. Edwards*,[31] where this court stated, " 'Mere constructive notice of the deed by reason of its being filed for record is not notice of the facts constituting the fraud.' "[32] Recording a deed or entering judgment alone is not enough in some instances to apprise a party of the fraudulent nature of a conveyance. However, the Burtons fail to reveal that *Smith*

27. See id. at 1262 ("[T]he remedy [of disregarding a conveyance] is not available ... when the property has been transferred from a fraudulent transferee to a third-party purchaser....").

28. See *Lach v. Deseret Bank*, 746 P.2d 802 (Utah Ct.App.1987) (judgment creditor cannot place lien against property of judgment debtor's grantee).

29. See, e.g., *Dahnken, Inc. of Salt Lake City v. Wilmarth*, 726 P.2d 420 (Utah 1986) (judgment creditors brought action to have assignment of real estate contract declared a fraudulent conveyance and therefore void); *Furniture Mfrs.*

*Sales, Inc. v. Deamer,* 680 P.2d 398 (Utah 1984) (creditor brought action to set aside allegedly fraudulent conveyance from debtor to debtor's wife).

30. *Esponda v. Ogden State Bank,* 75 Utah 117, 283 P. 729, 731 (1929); *see also Richardson v. MacArthur,* 451 F.2d 35, 39 (10th Cir.1971) (applying Utah law).

31. 81 Utah 244, 17 P.2d 264 (1932).

32. *Id.,* 17 P.2d at 270 (quoting *Duxbury v. Boice,* 70 Minn. 113, 72 N.W. 838, 839 (1897)).

also provides direction for determining what constitutes discovery of fraud:

> To ascertain what constitutes "a discovery of the facts constituting the fraud," reference must be had to the principles of equity. Hence, in actions in equity, the rule was that the means of knowledge were equivalent to actual knowledge; that is, that a knowledge of facts which would have put an ordinarily prudent man upon inquiry which, if followed up, would have resulted in a discovery of the fraud, was equivalent to actual discovery.[33]

The words "until the discovery [of fraud]" are generally interpreted as meaning from the time the fraud was actually known or could have been discovered through the exercise of reasonable diligence.[34] Specifically addressing section 78–12–26(3), this court stated that the three-year statute of limitations for fraud "begins to run from the time the person entitled to the property knows, or by reasonable diligence and inquiry should know, the relevant facts"[35] of the fraud perpetrated against him. Furthermore, we have previously observed: "The means of knowledge is equivalent to knowledge. A party who has opportunity of knowing the facts constituting the alleged fraud cannot be inactive and afterwards allege a want of knowledge that arose by reason of his own laches and negligence."[36]

In *Mason v. Laramie Rivers Co.*, shareholders sought to challenge the issuance of stock on the ground that it was fraudulent. The stock was issued in February 1963, and the plaintiffs filed their action in July 1969.

The *Mason* court found that the plaintiffs as stockholders had voted either personally or by proxy for the issuance of the stock at the February 1963 meeting. The stockholders had failed to examine the corporate records and had " 'been negligent and careless of their own interests.' "[37] The means of knowledge were open to the plaintiffs, and in the exercise of reasonable diligence, they would have discovered the alleged fraud.[38] *Mason* held that the plaintiffs' action was therefore time barred by the four-year statute of limitations for fraud actions.[39]

The Burtons argue that the alleged fraud took place when Willard Wood conveyed his interest in the property to his wife. It is conceivable that the Burtons could have discovered the fraud as early as May 1980, when the Wood-to-Wood deed was recorded. It is, however, more likely that the Burtons could have, or at least through the exercise of reasonable diligence should have, discovered the alleged fraud when the judgment against Willard Wood was obtained in June 1981.

In *Greco v. Pullara*,[40] a creditor brought an action to set aside a deed of trust as a fraudulent conveyance. *Greco* dealt with a statute similar to section 78–12–26(3)[41] and reasoned that the limitations period "begins to run when the defrauded person has knowledge of facts which in the exercise of proper prudence and diligence would enable him to discover the fraud."[42] The court held that the creditor was chargeable with constructive notice of the allegedly fraudulent conveyance at the time she be-

---

**33.** *Id.* (citing *Duxbury,* 72 N.W. at 839).

**34.** *See, e.g., Transamerica Ins. Co. v. Trout,* 145 Ariz. 355, 701 P.2d 851, 854 (Ct.App.1985); *Coronado Dev. Corp. v. Superior Court,* 139 Ariz. 350, 678 P.2d 535, 537 (Ct.App.1984); *Mason v. Laramie Rivers Co.,* 490 P.2d 1062, 1064 (Wyo.1971).

**35.** *Auerbach v. Samuels,* 349 P.2d 1112, 1116 (Utah 1960).

**36.** *Taylor v. Moore,* 87 Utah 493, 51 P.2d 222, 229 (1935) (citation omitted).

**37.** *Mason,* 490 P.2d at 1064–65 (quoting *Davis v. Harrison,* 25 Wash.2d 1, 167 P.2d 1015, 1024 (1946)).

**38.** *Id.* at 1065.

**39.** *Id.*

**40.** 166 Colo. 465, 444 P.2d 383 (1968).

**41.** Colo.Rev.Stat. § 87–1–10 (1963) provides, "Bills for relief on the ground of fraud, shall be filed within three years after the discovery by the aggrieved party, of the facts constituting such fraud, and not afterwards."

**42.** *Greco,* 444 P.2d at 384 (citations omitted).

came a judgment creditor and the statute of limitations began to run from the date of the judgment.[43]

Inasmuch as the Burtons were attempting to execute on a judgment lien and the purpose of a judgment lien is to provide a judgment creditor a way to obtain satisfaction of a judgment, it logically follows that after obtaining the judgment against Willard Wood, the Burtons should have searched for property upon which to levy. Nothing in the record suggests that a search was performed in 1981 when the Burtons obtained their judgment against Willard Wood. Had a search been made, exercising reasonable diligence and proper prudence, it surely would have uncovered the transfer from Wood to his wife. Discovery of the transfer would then have sparked further inquiry on the part of the Burtons.[44] If such inquiry had been pursued, the Burtons would have discovered facts surrounding the allegedly fraudulent conveyance. At the very least, discovery of the transfer should have incited suspicion of fraud. The Burtons may not have learned every detail of the alleged fraud or even discovered that actual fraud did in fact occur. However, it is not necessary for a claimant to know every fact about his fraud claim before the statute begins to run.[45] The means of knowledge were available to the Burtons, and upon obtaining the judgment against Willard Wood, they should have discovered facts surrounding the alleged fraud. Accordingly, the three-year limitation period imposed by section 78–12–26(3) began to run when the Burtons' judgment against Willard Wood was docketed. Consequently, the Burtons' claim to set aside the conveyance is time-barred.

## BONA FIDE PURCHASER

 Implicit in the trial court's findings is that when the Baldwins purchased the property from Tonya Wood, they took the property as bona fide purchasers. A bona fide purchaser is one who pays valuable consideration for a conveyance, acts in good faith, and takes without notice of an adverse claim or others' outstanding rights to the seller's title.[46] Therefore, under the Act, even if the conveyance from Wood to his wife was fraudulent, Baldwin's interest as a bona fide purchaser is not affected by the Burtons' execution on the property.[47]

The Burtons argue that the Baldwins were not bona fide purchasers when they purchased the property from Tonya Wood because the Baldwins had notice of the judgment lien against Willard Wood. The judgment lien therefore created an adverse interest in the property. The Burtons assert that the Baldwins had actual notice of the judgment lien by virtue of a title report issued by the Baldwins' title agent. There is no evidence in the title report that would give the Baldwins notice of the judgment lien against Willard Wood. More importantly, we have already determined that the conveyance was voidable, and at the time the Burtons obtained their judgment against Willard Wood, Wood held no interest in the property. Thus, the lien could not attach. When the Baldwins purchased the property from Tonya Wood, she was

---

**43.** *Id.*

**44.** A party is required to make inquiry if his findings would prompt further investigation. *See Diversified Equities v. American Sav. & Loan,* 739 P.2d 1133, 1137 n. 5 (Utah Ct.App. 1987), *cert. dismissed,* 779 P.2d 634 (Utah 1989).

**45.** *See Bedolla v. Logan & Frazer,* 52 Cal.App.3d 118, 125 Cal.Rptr. 59, 68 (1975).

**46.** *See Pender v. Dowse,* 1 Utah 2d 283, 265 P.2d 644, 648 (1954); *Peterson v. Peterson,* 112 Utah 554, 190 P.2d 135, 138 (1948); *J.C. Equip., Inc. v.*

*Sky Aviation, Inc.,* 498 S.W.2d 73, 76 (Mo.Ct. App.1973); *Glaser v. Holdorf,* 56 Wash.2d 204, 352 P.2d 212, 215 (1960).

**47.** Utah Code Ann. § 25–1–13 states:

Bona fide purchasers not affected. The provisions of this chapter shall not be construed to affect or impair the title of a purchaser for a valuable consideration, unless it appears that such purchaser had previous notice of the fraudulent intent of his immediate grantor, or of the fraud rendering void the title of such grantor.

the only owner of record. While there was a judgment against Willard Wood, no liens of record existed against the Baldwins' immediate grantor, Tonya Wood. As a result, the Baldwins did not discover any judgment liens on the property and therefore had no notice of any adverse interest in the property.

In the alternative, the Burtons contend that the Baldwins had constructive notice of the fraudulent nature of the conveyance from Tonya Wood to the Baldwins. The Burtons base their contention on the fact that the 1980 conveyance was of record and Willard Wood later signed the warranty deed that conveyed the property to the Baldwins. According to the Burtons, this was enough to extend notice to the Baldwins of the possibility of fraud in the conveyance and to cause the Baldwins to question Tonya Wood's ability to reconvey the property.

We disagree. In accordance with the above discussion, the conveyance has not been determined to be fraudulent and was therefore valid. Upon purchasing the property, the Baldwins had no reason to believe otherwise. Accordingly, at the time of the purchase, Tonya Wood was the only owner of record. The fact that Willard Wood signed the warranty deed conveying the property to the Baldwins does not affect Tonya Wood's title to the property, nor does it put the Baldwins on notice to inquire further into Willard Wood's interest in the property.[48]

In conclusion, we hold, in accordance with the requirements of section 25-1-13, that the Baldwins took the property without "notice of the fraudulent intent of [their] immediate grantor, or of the fraud rendering void the title of such grantor," and were therefore bona fide purchasers. Because the Baldwins were bona fide purchasers, the Burtons were further precluded from executing on the Baldwins' interest in the property.

## ATTORNEY FEES

■ Subsequent to the entry of summary judgment, Baldwin submitted an affidavit of attorney fees, setting forth a detailed summary of costs. She requested $12,715.25 in attorney fees and costs,[49] and the Burtons objected. Following a hearing, the trial court entered judgment in favor of Baldwin, requiring the Burtons to pay $7,872.66 in attorney fees and related damages. The Burtons appeal, arguing that the award of attorney fees was improper because the trial court did not indicate a legal basis for its conclusion.

■ When reviewing an award of attorney fees, we will affirm the trial court's ruling absent an abuse of discretion.[50] The general rule is that an award of attorney fees is appropriate only if authorized by statute or contract.[51] We note a statutory basis for the award of attorney fees under Utah Code Ann. § 78-27-56. Section 78-27-56(1) provides in part that "the court shall award reasonable attorney's fees to a prevailing party if the court determines that the action or defense to the action was without merit and not brought or asserted in good faith." We begin our analysis by addressing whether an award of attorney

---

**48.** A duty of inquiry requires a party to investigate and diligently do what his or her findings would reasonably prompt. The title search performed by the Baldwins showed Tonya Wood as the only titled owner of record. It is not reasonable to think that such a finding would prompt them to inquire further. *See Diversified Equities*, 739 P.2d at 1137 & n. 5 (purchasers who reasonable relied on title search did not need to make further inquiry).

**49.** Baldwin requested $3,192 in attorney fees, $328.06 in secretarial fees, and $9,195.19 in paralegal costs.

**50.** *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988) (citing *Turtle Management, Inc. v. Haggis Management, Inc.*, 645 P.2d 667, 671 (Utah 1982)).

**51.** *Dixie State Bank*, 764 P.2d at 988; *Golden Key Realty, Inc. v. Mantas*, 699 P.2d 730, 734 (Utah 1985); *Turtle Management, Inc.*, 645 P.2d at 671.

fees under section 78–27–56 was appropriate in this case and continue by addressing whether the amount of attorney fees awarded by the trial court was reasonable.

■ For a party to be entitled to attorney fees under section 78–27–56, the trial court must determine that a claim is "without merit" *and* that the party's conduct in bringing the suit "was lacking in good faith." [52] In *Cady*, we defined both of these elements, stating that "without merit" means "frivolous" or "having no basis in law or fact." [53] For purposes of section 78–27–56, we found the terms "lack of good faith" and "bad faith" to be synonymous.[54] To establish bad faith, one or more of the following must be lacking: " '(1) An honest belief in the propriety of the activities in question; (2) no intent to take unconscionable advantage of others; (3) no intent to, or knowledge of the fact that the activities in question will, [sic] hinder, delay or defraud others.' " [55]

The Burtons' 1986 execution on Baldwin's property compelled her to bring this action. The Burtons claim that their execution on Baldwin's property was neither without merit nor brought in bad faith. They contend that after learning of the scheduled foreclosure on the property, they proceeded to execute on the property as would any reasonable creditor under the circumstances. However, the record supports the trial court's findings that there was no factual or legal justification for the Burtons' actions. At the time the Burtons obtained their judgment, Willard Wood held no interest in the property. The Burtons' only lien rights in this matter were against the judgment debtor, Wood. Furthermore, contrary to the Burtons' assertion, when the Baldwins took the property from Tonya Wood, they were in no way successors in interest to Willard Wood and they were not subject to liability on the Burtons' judgment against Willard Wood. The Burtons were in error both factually and legally when they executed on the interest of Baldwin, the owner of the property.

Additionally, the Burtons exhibited a lack of good faith. The writ of execution appeared to be correct on its face in that it directed the sheriff to levy upon and sell Willard Wood's unexempt real property to satisfy the Burtons' judgment. However, the Burtons then issued a praecipe directing the sheriff to levy on the "right, title, and interest of Gregory Baldwin and Lynda Baldwin, successors in interest of Willard D. Wood." From that point forward, all subsequent documents leading up to the sale of the property were in error. The Baldwins were not successors in interest of Willard Wood and should never have been included in the execution proceedings. Had the Burtons proceeded with an honest belief in the propriety of their activities, they would have sought first to have the Wood-to-Wood conveyance set aside as fraudulent before attempting to wrongfully execute on Baldwin's interest in the property. Accordingly, we hold that Baldwin is entitled to an award of attorney fees under section 78–27–56.

■ In regard to the reasonableness of the amount of attorney fees awarded by the trial court, calculation of such fees is within the sound discretion of the trial court.[56] However, the trial court's award of attorney fees must be based on and supported by evidence in the record.[57] This court has developed factors for trial courts to consider when evaluating evidence to

---

**52.** *Cady v. Johnson,* 671 P.2d 149, 151 (Utah 1983).

**53.** *Id.*

**54.** *Id.* at 151–52.

**55.** *Id.* at 151 (quoting *Tacoma Assoc. of Credit Men v. Lester,* 72 Wash.2d 453, 433 P.2d 901, 904 (1967)).

**56.** *Jenkins v. Bailey,* 676 P.2d 391, 393 (Utah 1984).

**57.** *Dixie State Bank,* 764 P.2d at 988; *Jenkins,* 676 P.2d at 393.

determine what constitutes a reasonable fee.[58] Those factors include but are not limited to the extent of services rendered, the difficulty of issues involved, the reasonableness of time spent on the case, fees charged in the locality for similar services, and the necessity of bringing an action to vindicate rights.[59] In light of these factors, the attorney fee award appears to be reasonable. The evidence in the record supports the award, as does the fact that the trial court, in its discretion, substantially reduced the amount requested by Baldwin.

■ The Burtons also argue that even if we find that the trial court's award of attorney fees was proper, Baldwin is not entitled to recover paralegal costs. While the trial court did not specifically delineate any portion of the $7,872.66 as paralegal costs, the Burtons concluded that because only $3,192 of the total amount requested by Baldwin was for attorney fees, the remaining $4,680.66 must have been for paralegal costs. The Burtons contend that paralegal costs are not recoverable under Utah law and that cases which have found the award of paralegal fees to be appropriate involve instances where the paralegal performed under the direction and supervision of an attorney.[60] According to the Burtons, Paul Richins, an independent paralegal used by Baldwin's attorney, operated outside the attorney's control when he prepared a billing statement separate from the attorney's.

Simple arithmetic shows that at least some portion of the $7,872.66 awarded by the trial court was for paralegal costs.

This court has never specifically addressed the issue of whether paralegal fees are recoverable as part of an award of attorney fees. We do so now with regard to the facts of this case.

In *Continental Townhouses East Unit One Ass'n v. Brockbank*,[61] the Arizona Court of Appeals considered the issue of whether the value of legal work performed by legal assistants [62] could be considered as an element of attorney fees.[63] The plaintiffs' request for attorney fees included an itemization of hourly rates and time spent for both attorneys and legal assistants. Recognizing that the use of legal assistants has become an increasingly essential element of legal services provided by many law offices, the court ultimately held that services provided by legal assistants "may properly be included as elements in attorney fees applications and awards."[64] The rationale of the court was that allowing recovery for legal assistant fees promotes lawyer efficiency and decreases client litigation costs because a lawyer's time is free from tasks a legal assistant can perform at a lower rate.[65] The *Brockbank* court further noted that services performed by legal assistants are properly considered a component of attorney fees and are not automatically included in a lawyer's hourly billing rate as part of standard law office operating expenses but are often itemized and billed separately.[66]

Applying the reasoning of *Brockbank* to the facts of this case, it is clear that had Baldwin's attorney not retained Richins to perform services traditionally performed by legal assistants, the attorney would

---

**58.** See *Dixie State Bank*, 764 P.2d at 989; *Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984); *Jenkins*, 676 P.2d at 393; *Cabrera v. Cottrell*, 694 P.2d 622, 625 (Utah 1985); *Wallace v. Build, Inc.*, 16 Utah 2d 401, 402 P.2d 699, 701 (1965).

**59.** See *Trayner*, 688 P.2d at 858; *Cabrera*, 694 P.2d at 625; *Wallace*, 402 P.2d at 701.

**60.** See, e.g., *Multi–Moto v. ITT Commercial Fin. Corp.*, 806 S.W.2d 560, 570 (Tex.Ct.App.1991).

**61.** 152 Ariz. 537, 733 P.2d 1120 (Ct.App.1986).

**62.** The *Brockbank* court used the terms legal assistant, paralegal, and law clerk interchangeably in its opinion. *Id.*, 733 P.2d at 1128 n. 9.

**63.** *Id.*, 733 P.2d at 1126.

**64.** *Id.*, 733 P.2d at 1127.

**65.** *Id.*

**66.** *Id.*, 733 P.2d at 1127–28.

have had to perform these services himself at a presumably higher billing rate. Taking into account the trial court's substantial reduction in the amount requested, especially in the area of paralegal costs, and having concluded that the total award of attorney fees was reasonable, we find that it was proper for the trial court to include services provided by the paralegal in its award of attorney fees.

In short, this court finds that the trial court did not abuse its discretion in awarding Baldwin reasonable attorney fees. We therefore do not disturb the trial court's ruling.

UNAUTHORIZED PRACTICE OF LAW

■ While not an issue raised on appeal, we deem it appropriate to address a peripheral matter brought to our attention during oral argument. As noted above, Paul Richins assisted Baldwin's attorney as a paralegal. After judgment was entered in favor of Baldwin, Richins took assignment of the judgment. Richins then appeared pro se before this court, arguing in favor of Baldwin's position to uphold the trial court's rulings. While Richins is free to take assignment of the judgment, it would appear that he is statutorily precluded from appearing on his own behalf to represent his interests in the matter.[67]

Rule 5.5 of the Utah Rules of Professional Conduct prohibits lawyers from engaging in or assisting others in activities that constitute the unauthorized practice of law. While this might very well be an isolated incident, we are concerned that it might have the far-reaching effect of inspiring other members of the bar to similarly assign judgments to lay persons. In light of what is easily avoidable, we exhort all members of the bar to refrain from entering into such arrangements.

HOWE, Associate C.J., and STEWART, DURHAM and ZIMMERMAN, JJ., concur.