632 P.2d 39 (1981)
Walter WALLIS and Marlene Wallis, Plaintiffs and Respondents,
v.
H.E. THOMAS, International Equities, Inc., National Fund, Inc., and American Savings & Loan Association, Defendants and Appellants.
Walter WALLIS and Marlene Wallis, Plaintiffs and Respondents,
v.
H.E. THOMAS, International Equities, Inc., National Fund, Inc., American Savings & Loan Association, and Glen Justice Mortgage Company, Inc., Defendants and Appellants.
No. 17051.
Supreme Court of Utah.
June 2, 1981.
*40 Wayne G. Petty, Salt Lake City, for defendants and appellants.
Ronald C. Barker, Salt Lake City, for plaintiffs and respondents.
MAUGHAN, Chief Justice:
Plaintiffs initiated this action alleging that defendants had committed fraud and violated the Utah Uniform Land Sales Practices Act, Section 57-11-1, et seq., Utah Code Annotated, 1953, as amended, which is hereafter referred to as the Act. The matter was tried by the court, and plaintiffs were awarded judgment, providing the relief set forth in Section 57-11-17(2). Defendants appeal therefrom. The judgment of the trial court is affirmed. All statutory references are to Utah Code Annotated, 1953, as amended, unless otherwise specified.
Plaintiffs were the owners of a home, located in Salt Lake County, upon which they had two loans secured by mortgages. Plaintiffs had suffered certain financial reverses and had been unable to remain current on their loans, under these circumstances they felt great apprehension of an impending foreclosure action. In an attempt to resolve their financial crisis and preserve their equity in the home, plaintiffs listed the property for sale.
In July 1975, when a sale of the home had not been effected, plaintiffs responded to a newspaper advertisement of defendant, International Equities, Inc., (I.E.I.), wherein it represented it was purchasing equities in homes for cash. Initially, the home was inspected by an employee of I.E.I., thereafter the President, H.E. Thomas, defendant, met with the plaintiffs. The parties negotiated and then entered into a transaction in which plaintiffs conveyed their property to I.E.I., which assumed their two mortgages, and I.E.I. conveyed to plaintiffs ten acres of land situated in Iron County.
The trial court found that defendant Thomas, both individually and acting on behalf of I.E.I., made certain representations concerning the real property in Iron County. Defendant, Thomas, represented that the property was located within a five-minute drive from Brian Head Ski Resort; that the property was contiguous to agricultural property under cultivation; that the property was worth $15,000 ($1500 per acre); that the property was within one mile of utilities, water, and other services; that a subdivision was being developed which would be the equivalent of the Bell Canyon Acres Development in Salt Lake County; that the streets in the subdivision were in and white fencing was being placed on lots in the subdivision. The trial court found each of these representations involved a material fact concerning the real property, and each was false.
*41 In connection with the transaction defendant, Thomas, had a plat or subdivision map delivered to plaintiffs. Mr. Thomas showed plaintiffs the location of the two lots they were to receive in this subdivision of 192 lots. These two lots were identified by Mr. Thomas as being located on Cedar Avenue. Mr. Thomas further identified certain lots, which he represented were being reserved for commercial purposes, such as, shopping malls.
The trial court further found that defendant, I.E.I., had acquired 300 acres of property in Iron County in 1973. Defendant, I.E.I., had made four conveyances of a portion of this 300 acres between January 31, 1975 and July 8, 1975, the date of plaintiffs' conveyance. Defendant Thomas, was found to have directly controlled I.E.I. at all material times, and that he materially aided in the disposition of the Iron County property to plaintiffs.
The trial court specifically found that the 300-acre tract in Iron County owned by I.E.I. and shown to plaintiffs as a subdivision of 192 lots, was proposed by I.E.I. to be divided for the purpose of disposition into ten or more units. Defendants had not registered the subdivided lands pursuant to the Utah Uniform Land Sales Practices Act, Section 57-11-1, et seq. Defendants had not delivered a current public offering statement to plaintiffs as required under Section 57-11-5(2). Plaintiffs had not given defendants a receipt for the public offering statement as required by Section 57-11-5(3). Defendants were found to have participated in, promoted, and received the benefits resulting from the misrepresentations made to plaintiffs.
The trial court found that the consideration paid by plaintiffs for the subdivided land was the difference in the value of their home on July 8, 1975, and the amount of the indebtedness owed on the mortgages assumed by I.E.I. Such difference was $15,000, which was found to be the amount of plaintiffs' damages and for which defendants were jointly and severally liable. Plaintiffs were found to have incurred a reasonable attorney's fee in the sum of $5,000. Plaintiffs were awarded judgment for the damages, interest of 7% and attorney's fees as provided in Section 57-11-17(2).
The trial court ruled that the property conveyed by defendants to plaintiffs was a "subdivision" or "subdivided land" within the meaning of Section 57-11-2(6). The offer and conveyance of the property by defendants was in violation of Section 57-11-5, and defendants' untrue statements of material facts in disposing of the subdivided lands to plaintiffs violated Section 57-11-17(1)(b). The trial court did not make any findings in regard to the fraud action because of the disposition under the Act.
On appeal defendants concede the property in Iron County was not registered, and there was no current public offering statement delivered to plaintiffs, but they vigorously urge that the disposition to plaintiffs was not an interest in subdivided lands, a requisite to invoke the sanctions of the Act. According to defendants, there was preparation to subdivide the land, and the plat presented to plaintiffs was a preliminary subdivision map. However, after additional investigation of the expense involved, defendants claimed they abandoned their intent to subdivide sometime in February 1975, approximately five months prior to the conveyance to plaintiffs. The findings of the trial court indicate that defendants did not reveal their intent to abandon the subdivision project, and their offer and disposition to plaintiffs was of an interest in subdivided lands.
In construing this Act, the focus should be on its objective, i.e., the regulation of subdivided lands was designed for the prevention of fraud and sharp practices in a type of real estate transaction peculiarly open to such abuses.[1]
Section 57-11-5 provides:
"Unless the subdivided lands or the transaction is exempt under section 57-11-4:

*42 "(1) No persons shall offer or dispose of any interest in subdivided lands located in this state nor offer or dispose in this state of any interest in subdivided lands located without this state prior to the time the subdivided lands are registered in accordance with this act; ..."
Section 57-11-2(6), provides:
"`Subdivision' and `subdivided lands' means any land which is divided or is proposed to be divided for the purpose of disposition into ten or more units...." [Emphasis supplied.]
Section 57-11-21 provides:
"This act shall be so construed as to effectuate its general purpose to make uniform the law of those states which enact it."
The Utah Act with certain modifications follows the 1966 Uniform Land Sales Practices Act. Section 1(6) therein provides:
"`Subdivision' and `subdivided lands' mean any land which is divided or is proposed to be divided for the purpose of disposition into [25] or more lots, parcels, units or interests ..."[2]
The comment following this subsection states:
"Copied in part from section 11.000 California Real Estate Law, and in part from section 478.021(5), Florida Statutes. It should be noted that this definition does not require the land to be presently subdivided, ..."[3]
The act clearly indicates that the land need not be presently subdivided but only be proposed to be divided for purpose of disposition to constitute "subdivided lands." The term "propose" connotes to form or declare a plan or intention.[4] The actions of defendants, in displaying the subdivision map and indicating the location of the streets, the lots which plaintiffs were offered, and the parcels which defendants claimed were to be reserved for commercial development, constitute the declaration of a plan (a proposal) to divide the land for purpose of disposition. The trial court court did not err in its ruling that the property conveyed by defendants to plaintiffs was subdivided land within the purview of Section 57-11-2(6).
Section 57-11-17, provides:
"(1) Any person who:
"(a) Disposes of subdivided lands in violation of section 57-11-5;
"(b) In disposing of subdivided lands, makes an untrue statement of a material fact; or
"(c) In disposing of subdivided lands, omits a material fact required to be stated in registration statement, public offering statement, statement of record or public report, necessary to make the statements made not misleading; is liable as provided in this section to the purchaser unless, in the case of an untruth or omission, it is proved that the purchaser knew of the untruth or omission or that the person offering or disposing of subdivided lands did not know and in the exercise of reasonable care could not have known of the untruth or omission."
Defendants attempt to invoke the defense contained in this section by arguing the plaintiffs did not exercise reasonable care by their failure to investigate the proffered real estate and discover its actual condition. The record indicates that at the time of the transaction defendant, Thomas, had only flown over the property in an airplane as there were no roads to it, and defendants claim plaintiffs could have discovered this condition. Defendants' assertion is without merit and is predicated on a basis contrary to the expressed language of the statute, for the defense provided therein requires actual knowledge of the purchaser as to the untruth or omission. The standard that the purchaser must exercise reasonable care to determine the truthfulness of any material representation has not been included in the statutory defense. *43 Furthermore, the defense would be of no avail to relieve defendants liability under the Act, for plaintiffs are entitled to recover under Section 57-11-17(1)(a), viz., defendants disposed of subdivided land in violation of Section 57-11-5.
Defendants further contend the disposition of the land to plaintiffs was exempt under Section 57-11-4(1)(a) and (c).
Section 57-11-4(1), provides:
"Unless the method of disposition is adopted for the purpose of evasion of this act, or the provisions of the federal act, the provisions of this act do not apply to offers or dispositions of an interest in land:
"(a) By a purchaser of subdivided lands for his own account in a single or isolated transaction;
* * * * * *
"(c) To any person who acquires that interest for use in the business of constructing residential, commercial, or industrial buildings; or to any person who acquires that type of land for the purpose of disposition to a person engaged in such business. This exemption shall not apply if the person who acquires land for these purposes sells that land to individuals as unimproved lots with no legal obligation on the part of the seller to construct a residential, commercial, or industrial building on that lot within two years from the date of disposition; ..."
Defendants urge the disposition of land to plaintiffs was an isolated transaction and exempt under Section 57-11-4(1)(a). Defendants have misconstrued this provision, for it is designed to make it unnecessary for individual lot purchasers, such as, plaintiffs, to comply with the Act upon resale even though the lands have been previously registered.[5] Likewise, the exemption in Section 57-11-4(1)(c) is inapplicable, for there was no evidence plaintiffs were engaged in the construction business. The evidence indicates the plaintiffs accepted the conveyance in lieu of cash for the equity in their home and not to embark on a venture of constructing homes for resale as a business.
Finally, plaintiffs claim they are entitled to attorney's fees for this appeal. Section 57-11-17(2) provides that the purchaser may recover reasonable attorneys' fees. If a plaintiff be required to defend his position on appeal at his own expense, the comprehensive rights bestowed upon him by the Act will be diminished contrary to the designed objective of this legislation; therefore, a purchaser is entitled to attorney's fees for his appeal. This Court so ruled under a statute of similar remedial import in the recent decision of Coates v. American Economy Insurance Company, 627 P.2d 92 (1981). The decision in the Coates case further disposes of defendants' final argument that plaintiffs cannot recover their attorney's fees because they did not file a cross-appeal in accordance with the requirements of Rules 74(b) and 75(d), U.R.C.P. In Coates this Court held that no cross-appeal was necessary where plaintiffs merely sought attorney's fees incurred in defending their judgment on appeal. The judgment of the trial court is affirmed,[6] and the cause is remanded to the trial court to determine plaintiffs' attorney's fees on this appeal. Costs are awarded to plaintiffs.
HALL, HOWE, STEWART and OAKS, JJ., concur.
NOTES
[1] People v. Byers, 90 Cal. App.3d 140, 153 Cal. Rptr. 249, 253 (1979).
[2] 7A U.L.A. 372-373.
[3] Id. at p. 373.
[4] Webster's Third New International Dictionary.
[5] See Comment to Sec. 3(a)(1) of the Uniform Act in 7A U.L.A. 375.
[6] Since the judgment for plaintiffs has been affirmed, the trial court should dismiss with prejudice their cause of action for fraud.