The **WORLD PEACE MOVEMENT OF AMERICA, an unincorporated association, and Israel K. Malupo, Plaintiffs and Appellants,**

v.

**NEWSPAPER AGENCY COR-
PORATION, INC., Defen-
dant and Appellee.**

No. 920507.

Supreme Court of Utah.

July 27, 1994.

Brian M. Barnard, John Pace, Salt Lake City, for plaintiffs.

Michael Patrick O'Brien, Sharon E. Sonnenreich, D. James Morgan, Salt Lake City, for defendant.

Kathryn D. Kendell, Salt Lake City, for amicus curiae American Civil Liberties Union.

DURHAM, Justice:

Plaintiff The World Peace Movement of America ("World Peace Movement") appeals from a Third District Court order dismissing its civil rights action against defendant Newspaper Agency Corporation ("NAC"). World Peace Movement also appeals a second order awarding NAC the sum of $17,047 in actual and necessary expenses incurred in defending the action. We affirm the district court's order dismissing the civil rights action but vacate its order awarding expenses to NAC.

The relevant facts of this case are undisputed. World Peace Movement is an unincorporated religious association led by Israel K. Malupo. NAC is a for-profit corporation that serves as an agent for two privately owned newspapers, the *Deseret News* and *The Salt Lake Tribune*. The *Deseret News* is published by the Deseret News Publishing Company, which is owned by The Church of Jesus Christ of Latter-day Saints. *The Salt Lake Tribune* is published by the Kearns–Tribune Corporation. NAC provides circulation, advertising, production, and other services for both newspapers. Each newspaper, however, maintains independent editorial functions and separately decides what it will and will not publish. The publisher of each paper sets guidelines as to the types of advertisements the paper will accept and reserves the right to decline to publish an advertisement on the basis of content. NAC, in its capacity as agent, implements the advertising guidelines established by each publisher.

In September 1990, Malupo attempted to place an advertisement on behalf of World Peace Movement in *T.V. Week*, the television weekly NAC prints for the *Deseret News* and *The Salt Lake Tribune*. *T.V. Week* contains a blend of feature stories and advertisements, along with schedules for the coming week's television viewing. The group's advertisement contained a brief spiritual message accompanied by a black and white portrait which World Peace Movement describes as "a dark-skinned man with Polynesian features, dressed in biblical garb."

According to World Peace Movement's beliefs and doctrines, the portrait accurately portrays Jesus Christ "as a mortal about 2,000 years ago." The purpose of the advertisement was to explain World Peace Movement's teachings and to invite public inquiry into its religious doctrines. By including the portrait in the advertisement, World Peace Movement hoped to convey one of its central tenets—the belief that Jesus Christ had a dark complexion.

While *The Salt Lake Tribune* agreed to publish the advertisement in its entirety, the *Deseret News* refused. After receiving the advertisement, NAC employees presented it to Wm. James Mortimer, NAC director and publisher of the *Deseret News,* for his review. Mortimer agreed to publish the text of the

advertisement in the *Deseret News'* version of *T.V. Week,* but he refused to print the accompanying portrait. Subsequent letters written from NAC employees to World Peace Movement indicate that Mortimer and the *Deseret News* found the complete advertisement "unacceptable" because it "was not in good taste and could be offensive to [*Deseret News* ] readers." [1]

NAC informed Malupo of the newspapers' respective positions. Affidavits submitted by NAC indicate, and World Peace Movement does not dispute, that Malupo agreed to this arrangement and approved the advertisements. On September 23, 1990, NAC published the complete advertisement in *The Salt Lake Tribune*'s version of *T.V. Week,* while the *Deseret News'* version carried only the text.

During the ensuing week, World Peace Movement informed NAC that both advertisements contained an incorrect phone number. Although Malupo had inspected and approved the advertisements, NAC agreed to republish them in the newspapers' September 30, 1990, versions of *T.V. Week.* Thus, as of September 30, 1990, *The Salt Lake Tribune* had twice published the complete advertisement and the *Deseret News* had twice published the text of the advertisement.

On October 1, 1990, World Peace Movement attempted to contract with NAC to publish the *complete* advertisement in *both* newspapers' *T.V. Week.* World Peace Movement sought to place the advertisement for twenty-six weeks in full color. However, NAC refused to place the complete advertisement in either newspaper.

NAC's blanket refusal apparently resulted from a change in *T.V. Week* printing policy. When Malupo first submitted the advertisement, each newspaper provided its subscribers with a different version of *T.V. Week.* Thus, it was possible for *The Salt Lake Tribune* to print an advertisement that the *Deseret News* had rejected. However, in late September or early October, NAC, *The Salt Lake Tribune,* and the *Deseret News* revised

their printing policies and decided to publish a single version of *T.V. Week* for both newspapers. Under the new procedure, one newspaper could still accept *T.V. Week* advertisements that the other rejected, but the accepting newspaper had to pay the additional production costs incurred by NAC. Apparently, NAC refused to publish World Peace Movement's advertisement in *The Salt Lake Tribune* solely because the *Deseret News* refused to carry the portrait.

After exchanging several letters concerning the advertisement and NAC's reasons for rejecting it, on April 10, 1992, World Peace Movement filed a religious discrimination lawsuit against NAC under the Utah Civil Rights Act (the "Act"). Utah Code Ann. §§ 13–7–1 to –4 (1992). World Peace Movement's amended complaint, filed May 21, 1992, alleged that NAC unlawfully rejected the advertisement because it "offended or might offend the religious beliefs or ideals of [NAC], the *Deseret News* and/or some of the readers of the *Deseret News.*" According to World Peace Movement, this rejection amounted to religious discrimination because it was "based upon the religious content of the ad and the religious message to be conveyed by said ad," or more specifically, "the picture therein and the religious message to be conveyed by said picture." World Peace Movement sought a determination and declaratory ruling that NAC's conduct violated the Utah Civil Rights Act, a permanent injunction ordering NAC to cease its discriminatory practices, monetary damages, attorney fees, and court costs.

NAC filed a motion to dismiss that was alternatively fashioned as a motion for summary judgment. World Peace Movement responded with a motion for partial summary judgment. Both parties filed supporting memoranda and affidavits along with their respective motions.

Following oral argument, the district court dismissed World Peace Movement's motion for partial summary judgment and granted NAC's motion to dismiss or alternatively for

---

1. NAC claims that Mortimer rejected the complete advertisement because he "interpreted the advertisement as Mr. Malupo presenting himself as Jesus Christ and determined that it was offensive to him and could also be offensive to other readers of the *Deseret News.*" While the parties make much of this distinction, we find it irrelevant, given our decision today.

summary judgment. An October 6, 1992, order reflected the district court's decision.[2] Although the order did not provide detailed findings of fact, it indicated that the district court had based its decision on "the reasons articulated in Defendant NAC's memoranda." NAC subsequently filed a request for actual and necessary expenses pursuant to subsection 13–7–4(d) of the Act. The district court awarded NAC the sum of $17,047, consisting of $17,037 in attorney fees and $10 in court costs.

World Peace Movement appeals both district court orders to this court. We note that the issues presented are questions of first impression.

Summary judgment is appropriate when there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. Utah R.Civ.P. 56(c); *Winegar v. Froerer Corp.*, 813 P.2d 104, 107 (Utah 1991). In reviewing the trial court's ruling, we view the facts and all reasonable inferences arising therefrom in the light most favorable to the losing party. *Id.* Because a challenge to summary judgment presents for review only questions of law, we accord no deference to the trial court's conclusions but review them for correctness. *Schurtz v. BMW of N. Am., Inc.*, 814 P.2d 1108, 1111–12 (Utah 1991).

On appeal, World Peace Movement clarifies the nature of its religious discrimination claim. In essence, it argues that religious discrimination is unique among civil rights claims in that an individual's religion often cannot readily be surmised from that individual's appearance. Thus, before a business establishment can discriminate on religious grounds, it must somehow be "tipped-off" as to the individual's religious beliefs. World

Peace Movement contends that its advertisement provided NAC with that information.

According to World Peace Movement, NAC decided to discriminate against the group after Mortimer inspected the advertisement and learned that World Peace Movement believed Jesus Christ had a dark complexion. Again, this belief is a central tenet of their religion. Thus, World Peace Movement argues that in refusing its publishing services on the basis of the advertisement's depiction of Jesus Christ, NAC discriminated against its members on the basis of their religious convictions in violation of section 13–7–3 of the Act.

NAC defends its conduct on both statutory and constitutional grounds. At the statutory level, it argues that World Peace Movement's claims must be dismissed because NAC's conduct did not violate the Act.[3] NAC claims that it did not unlawfully discriminate against members of World Peace Movement because of their religion. Rather, it contends that as the *Deseret News'* agent, it simply exercised editorial discretion and refused to accept World Peace Movement's advertisement on the basis of content. NAC insists that "[a]nyone else presenting an advertisement with similarly-offensive content would have been treated similarly." Thus, NAC asserts that no unlawful discrimination occurred.

At the constitutional level, NAC contends that World Peace Movement's claim is precluded by the free speech and press guarantees of both the state and federal constitutions. Under this argument, NAC relies heavily on *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 257–58, 94 S.Ct. 2831, 2839–40, 41 L.Ed.2d 730 (1974), which held unconstitutional a state statute granting political candidates a "right of reply" in news-

---

2. Although the district court's order purported to grant a "motion to dismiss," NAC's supporting memorandum contained material outside the pleadings. When affidavits and/or other evidence is presented in conjunction with a motion to dismiss under rule 12(b)(6) of the Utah Rules of Civil Procedure, the motion is generally treated as a motion for summary judgment pursuant to rule 56. *See* Utah R.Civ.P. 12(b), 56(c); *Warren v. Provo City Corp.*, 838 P.2d 1125, 1127 n. 2 (Utah 1992); *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 999 (Utah 1991). Thus, both

NAC's motion and the district court's order are properly viewed as involving summary judgment.

3. NAC's brief also insists that NAC is exempt from the Act because the "pages of a newspaper" are not "business establishments" or "places of public accommodation" within the meaning of the Act. However, NAC's counsel conceded at oral argument that NAC is subject to the Act as a business establishment which provides a service to the public.

papers that have assailed their personal characteristics or official record, along with other federal case law for two corollary propositions: (1) an advertiser has no constitutional right of access to a private newspaper; and (2) government cannot compel a private newspaper to print or refuse to print any material, without violating article I, section 15 of the Utah Constitution[4] and the First Amendment to the United States Constitution.[5] NAC points out that free speech and free press guarantees "include[ ] both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard,* 430 U.S. 705, 714, 97 S.Ct. 1428, 1435, 51 L.Ed.2d 752 (1977). Adopting World Peace Movement's position, concludes NAC, will unconstitutionally grant prospective advertisers a right of access to private newspapers, compelling newspapers to publish advertisements which they deem offensive or to "speak" when they choose to refrain.

World Peace Movement responds to NAC's constitutional arguments by asserting that neither article I, section 15 nor the First Amendment shields NAC's conduct. Relying on *KUTV, Inc. v. Conder,* 668 P.2d 513, 521 (Utah 1983), which recognized that article I, section 15 does not create an absolute right that defeats all other freedoms and interests protected by the Utah Constitution, and *Pittsburgh Press Co. v. Pittsburgh Commission on Human Relations,* 413 U.S. 376, 389, 391, 93 S.Ct. 2553, 2560–61, 2562, 37 L.Ed.2d 669 (1973), which upheld an ordinance prohibiting newspapers from listing "help-wanted" advertisements in sex-designated columns, World Peace Movement notes that government may infringe on newspapers'

free speech and free press rights when a compelling state interest, such as eradicating religious discrimination, is at stake. Thus, World Peace Movement concludes that the Utah Civil Rights Act lawfully circumscribes NAC's article I, section 15 and First Amendment rights.

*1. Interpreting the Utah Civil Rights Act*

▬ Although the parties urge myriad constitutional claims and defenses upon us, "[i]t is a fundamental rule that this Court should avoid addressing constitutional issues unless required to do so." *State v. Anderson,* 701 P.2d 1099, 1103 (Utah 1985). Accordingly, we first examine the parties' statutory claims. Because we conclude that World Peace Movement does not have a cognizable claim under the Act, we do not reach the parties' constitutional arguments.

The operative language in this case is "[a]ll persons ... are entitled to full and equal ... services ... without discrimination on the basis of ... religion." Utah Code Ann. § 13–7–3.[6] The Act generally prohibits business establishments and other covered entities from discriminating against "persons" based on certain suspect classifications, including religion. *See id.* §§ 13–7–1, –3. The Act guarantees to individuals who fall within these suspect classifications full and equal access to the goods, services, facilities, etc., offered by business establishments and other covered entities.

▬ We conclude from this language that the Act prohibits NAC from denying its advertising services on the basis of the religion of the person seeking those services. Never-

---

**4.** This provision states in pertinent part, "No law shall be passed to abridge or restrain the freedom of speech or of the press." Utah Const. art. I, § 15.

**5.** The First Amendment to the United States Constitution states in pertinent part, "Congress shall make no law ... abridging the freedom of speech, or of the press." U.S. Const. amend. I.

**6.** Section 13–7–3 states in its entirety:

All persons within the jurisdiction of this state are free and equal and are entitled to full and equal accommodations, advantages, facilities, privileges, goods and services in all busi-

ness establishments and in all places of public accommodation, and by all enterprises regulated by the state of every kind whatsoever, without discrimination on the basis of race, color, sex, religion, ancestry or national origin. Nothing in this act shall be construed to deny any person the right to regulate the operation of a business establishment or place of public accommodation or an enterprise regulated by the state in a manner which applies uniformly to all persons without regard to race, color, sex, religion, ancestry, or national origin; or to deny any religious organization the right to regulate the operation and procedures of its establishments.
Utah Code Ann. § 13–7–3.

theless, under the plain language of the Act, a publisher may discriminate on the basis of content even when content overlaps with a suspect classification like religion. For example, a Jewish-owned and -operated newspaper which serves a primarily Jewish community might lawfully refuse advertisements propagating anti-Semitic "religious" sentiments. However, that same newspaper could not single out members of an anti-Semitic religious group and refuse to accept advertisements, regardless of content, from any member of that group *simply because they are a member of that group*. Such discrimination, which is directed at the individual seeking to place the advertisement rather than at the content of the advertisement, is prohibited by the Act.[7]

█ The Act, however, does not prohibit "discrimination" against religious beliefs, ideas, or sentiments standing alone, apart from the persons who hold and profess them. World Peace Movement appears to be entirely correct in its assertion that NAC refused to print its advertisement because of its religious message that Jesus Christ had a dark complexion. Nevertheless, it was the message itself that NAC rejected, not its propo-

nents. NAC would have refused to print the advertisement had it been offered by any person of any religion. This conduct was not a denial of services to a person on the basis of religion within the meaning of the Act. In fact, the Act expressly permits NAC to establish and enforce such uniform editorial standards. *See* Utah Code Ann. § 13–7–3.

Furthermore, World Peace Movement does not allege that NAC refused to accept other advertisements, whether or not religious in nature, submitted by World Peace Movement members. NAC simply rejected this particular advertisement on the basis of content. As the situation stands, World Peace Movement, like any other person or entity, is free to purchase advertising from NAC subject to NAC's editorial judgment.[8]

### 2. Attorney Fees and Section 13–7–4

World Peace Movement next challenges the district court's award, pursuant to subsection 13–7–4(d), of $17,047 to NAC for its expenses in defending the action. World Peace Movement alleges three errors in the district court's interpretation and application of section 13–7–4.[9] It claims that the district

---

7. Our interpretation of the Act is consistent with California's construction of the Unruh Civil Rights Act. *See* Cal.Civ.Code §§ 51, 51.5 (West 1982 & Supp.1994). For example, in *Pines v. Tomson*, 160 Cal.App.3d 370, 206 Cal.Rptr. 866 (1984), the defendant publisher appealed a trial court's order granting the plaintiff relief under the Unruh Civil Rights Act. The appellate court upheld that part of the trial court's order which enjoined the publisher "from refusing advertisements on the ground the *person attempting to place an advertisement* is not, or will not affirm that he, is a 'born-again' Christian." *Id.* at 877 (emphasis added). The appellate court further stated that the order "merely requires [publishers] to *act* in a non-discriminatory manner toward all *prospective advertisers*." *Id.* at 878 (second emphasis added); *see also Cyntje v. Daily News Pub. Co.*, 551 F.Supp. 403, 405 (D.V.I. 1982) ("So long as such a refusal [to publish an advertisement] is not ... based on an ... invidiously discriminatory classification *among those seeking to place advertisements*, a publication cannot ... be compelled to print or to disseminate a paid advertisement." (emphasis added)).

8. This interpretation of the Act comports with the general principle that we construe statutes to avoid running afoul of constitutional prohibitions. *See State v. Wood*, 648 P.2d 71, 82 (Utah), *cert. denied*, 459 U.S. 988, 103 S.Ct. 341, 74

L.Ed.2d 383 (1982). As the United States Supreme Court clearly reaffirmed in *Miami Herald Publishing Co. v. Tornillo*, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974), a newspaper's exercise of editorial control and judgment is a constitutionally protected process:

> A newspaper is more than a passive receptacle or conduit for news, comment, and advertising. The choice of material to go into a newspaper, and the decisions made as to limitations on the size and content of the paper, and treatment of public issues and public officials—whether fair or unfair—constitute the exercise of editorial control and judgment. It has yet to be demonstrated how governmental regulation of this crucial process can be exercised consistent with First Amendment guarantees of a free press as they have evolved to this time.

*Id.* at 258, 94 S.Ct. at 2840 (footnote omitted). Under our construction of the Act, NAC's constitutional right to exercise editorial discretion over content simply does not conflict with the individual rights granted by the Act.

9. Section 13–7–4 states:

> Any business establishment or place of public accommodation or enterprise regulated by the state in which a violation of the rights

court erred in concluding that (1) subsection 13–7–4(d) applies to civil cases brought under subsection 13–7–4(c); (2) the term "expenses" in subsection 13–7–4(d) includes attorney fees and court costs; and (3) a prevailing defendant may be awarded expenses under subsection 13–7–4(d) without a finding that plaintiff's lawsuit was frivolous.

The proper construction of section 13–7–4 is a question of law. *State v. Larsen,* 865 P.2d 1355, 1357 (Utah 1993); *State v. James,* 819 P.2d 781, 796 (Utah 1991). Accordingly, we grant no particular deference to the district court's rulings but review them for correctness. *Ward v. Richfield City,* 798 P.2d 757, 759 (Utah 1990).

■ When faced with a question of statutory construction, we look first to the plain language of the statute. *Larsen,* 865 P.2d at 1357; *Schurtz v. BMW of N. Am., Inc.,* 814 P.2d 1108, 1112 (Utah 1991); *Bonham v. Morgan,* 788 P.2d 497, 500 (Utah 1989) (per curiam). Only when we find ambiguity in the statute's plain language need we seek guidance from the legislative history and relevant policy considerations. *Schurtz,* 814 P.2d at 1112; *Bonham,* 788 P.2d at 500. Because the plain language of section 13–7–4 does not resolve all of World Peace Movement's claims, we rely on relevant legislative history and policy considerations when necessary.

■ With respect to World Peace Movement's first claim, we find no error in the district court's conclusion that subsection 13–7–4(d) applies to civil suits brought under

subsection 13–7–4(c) as well as to proceedings or cases initiated by the attorney general under subsections 13–7–4(a) and (b). We base this conclusion on the plain language of the statute.

Section 13–7–4 first defines "public nuisance" and then delineates the means by which such a public nuisance may be enjoined. Specifically, an individual may seek attorney general intervention under subsections 13–7–4(a) or (b) or initiate a civil suit under subsection 13–7–4(c). A court may award expenses under subsection 13–7–4(d) only when a covered entity "is determined or found not to be in violation of this act." Utah Code Ann. § 13–7–4(d). Because a covered entity may be found innocent of an alleged violation in any of the enumerated types of claims, subsection 13–7–4(d) logically applies to all three of the remedial measures. *See Clover v. Snowbird Ski Resort,* 808 P.2d 1037, 1045 (Utah 1991) (recognizing that a statute should be read as comprehensive whole). In addition, the terms of subsection 13–7–4(d) are not limited to actions involving attorney general intervention. Rather, having defined a violation of the Act as a public nuisance, subsection 13–7–4(d) simply provides that a defendant "determined or found not to be in violation of this act" may be awarded actual and necessary expenses. Utah Code Ann. § 13–7–4(d).

■ We similarly find no error in the district court's conclusion that subsection 13–7–4(d) contemplates an award of both attorney fees and court costs. In making this deter-

provided in Section 13–7–3 of this act occurs is a public nuisance. The operator of any such business establishment or place of public accommodation or enterprise regulated by the state shall be deemed guilty of maintaining a public nuisance and may be enjoined as hereinafter provided.

(a) Upon application to the attorney general by any person denied the rights guaranteed by Section 13–7–3, the attorney general shall investigate and seek to conciliate the matter.

(b) An action to enjoin any nuisance defined in this section may be brought in the name of the state of Utah by the attorney general. Upon the trial of the cause, on finding that the material allegations of the complaint are true, the court shall order such nuisance to be abated, and enjoin all persons from maintaining or permitting such nuisance. When any injunction as herein provided has been granted it

shall be binding upon the defendant and shall act as an injunction in personam against the defendant throughout the state.

(c) Any person who is denied the rights provided for in Section 13–7–3 shall have a civil action for damages and any other remedy available in law or equity against any person who denies him the rights provided for in Section 13–7–3 or who aids, incites or conspires to bring about such denial.

(d) Any business establishment or place of public accommodation or enterprises regulated by the state charged with maintaining a public nuisance in violation of this act, which is determined or found not to be in violation of this act, may be awarded all actual and necessary expenses incurred in defending such action, as determined and approved by the court having jurisdiction of the matter.

Utah Code Ann. § 13–7–4.

mination, we are persuaded by both the plain language of the statute and the relevant legislative history. Subsection 13–7–4(d) states that the court may award an innocent defendant "all actual and necessary expenses incurred in defending such action." Utah Code Ann. § 13–7–4(d). While the phrase does not expressly refer to attorney fees or court costs, its meaning is nonetheless clear. Individuals accused of civil rights violations *defend* the action by hiring counsel to represent them. The expense of hiring an attorney, in addition to other court costs, certainly falls into the category of actual and necessary. Moreover, use of the word "all" indicates that subsection 13–7–4(d) takes an inclusive, rather than an exclusive, approach to expenses. Such an inclusive approach strongly supports the conclusion that subsection 13–7–4(d) permits an award of both attorney fees and court costs.

Nevertheless, there is at least some ambiguity in the legislature's decision to use the phrase "all actual and necessary expenses incurred in defending such action" rather than expressly referring to "attorney fees" and/or "court costs." However, the legislative history of subsection 13–7–4(d) amply demonstrates that the legislature intended the subsection to cover both court costs and attorney fees. As originally presented to the state legislature, section 13–7–4 did not contain a mechanism to reimburse innocent defendants. *See* Floor Debate, vote on S.B. 44, 36th Legis., Gen.Sess. (Jan. 28, 1965) (Senate Recording No. 4). The legislature unanimously approved subsection 13–7–4(d) as an amendment before the Act passed in its final version. *Id.*

Prior to incorporating subsection 13–7–4(d) into then Senate Bill 44, Senator Brockbank,

the amendment's sponsor, articulated the intent underlying the proposed provision:

> As an example, I'm concerned about the economic effect of bringing an unwarranted action against a small businessman or a series of unwarranted actions against a large businessman. My intent in offering this amendment is to make it more difficult, if not impossible, to put any person or corporation out of business merely because of the burden assumed in defending lawsuits.

Floor Debate, vote on S.B. 44, 36th Utah Legis., Gen.Sess. (Jan. 28, 1965) (Senate Recording No. 4) (statement of Sen. Brockbank). Thus, the legislature intended that subsection 13–7–4(d) preclude unwarranted civil rights actions from forcing a person or corporation out of business due to the burden assumed in defending a lawsuit. Court costs alone, which in the instant case amounted to only $10, will seldom, if ever, be capable of bankrupting a defendant. Attorney fees, on the other hand, may create a staggering financial burden. Clearly, the legislature intended to subsume both attorney fees and court costs into subsection 13–7–4(d)'s "expenses." [10]

With respect to World Peace Movement's final claim of error, we note that the plain language of subsection 13–7–4(d) offers some guidance as to whether that provision incorporates a frivolousness standard. Subsection 13–7–4(d) states that a prevailing defendant "*may* be awarded all actual and necessary expenses incurred in defending such action." Utah Code Ann. § 13–7–4(d) (emphasis added). Thus, subsection 13–7–4(d) grants the district court a certain measure of discretion in awarding expenses.

Based on the legislative history cited above, we conclude that the proper exercise

---

**10.** In his concurring and dissenting opinion, Justice Russon asserts that subsection 13–7–4(d) applies only to filing fees and similar costs, contending that basic rules of statutory construction forbid reading "attorney fees" into the phrase "all actual and necessary expenses." While we are mindful of the general prohibition against awarding attorney fees in the absence of statutory or contractual authorization, we do not believe that the plain language of subsection 13–7–4(d) is as clear as Justice Russon claims. Consequently, we engage in an analysis of the relevant legislative history.

Dissatisfied with our interpretation of the legislative intent, Justice Russon attempts to undermine our position by mischaracterizing today's decision as setting a "dangerous precedent" that "would allow for the award of attorney fees whenever a statute or contract provides for one side to pay expenses, even when such attorney fees were not contemplated." We do not set that precedent. We hold only that *this particular provision,* subsection 13–7–4(d), when viewed in light of its legislative history, contemplates an award of both attorney fees and court costs.

of the discretion afforded courts by subsection 13–7–4(d) turns on whether the plaintiff's action was "unwarranted" or frivolous. Senator Brockbank submitted subsection 13–7–4(d) as an amendment because he was concerned about the harmful economic effects of *unwarranted*, as opposed to colorable or meritorious, civil rights claims. Thus, the legislative history evidences an intent to assess expenses against only those plaintiffs who initiate unwarranted or frivolous civil rights actions.

Furthermore, the policy considerations underlying the Act as a whole strongly support this conclusion. The Act establishes that "discrimination on the basis of race, color, sex, religion, ancestry, or national origin in business establishments or [other covered entities] endangers the health, safety, and general welfare of this state and its inhabitants ... and that such discrimination ... violates the public policy of this state." Utah Code Ann. § 13–7–1. The Act is designed "to assure all citizens full and equal availability of all goods, services and facilities offered by business establishments [and other covered entities] without discrimination because of race, color, sex, religion, ancestry, or national origin." *Id.* Furthermore, the Act "shall be liberally construed with a view to promote the policy and purposes of the act and to promote justice." *Id.* Thus, the Act is intended to eradicate unlawful discrimination by encouraging private citizens to seek redress for civil rights violations, particularly

when the citizen is of modest means and/or the relief sought is not a large monetary judgment. Indeed, "[t]he language of the Act amply demonstrates that the legislature intended it to be construed as broadly as possible to combat invidious discrimination in Utah." *Beynon v. St. George–Dixie Lodge # 1743*, 854 P.2d 513, 517 (Utah), *cert. denied*, —— U.S. ——, 114 S.Ct. 195, 126 L.Ed.2d 153 (1993).

Forcing unsuccessful civil rights plaintiffs to pay the defendants' expenses, regardless of the merits of the plaintiffs' claims, would discourage future plaintiffs from seeking the full protection of the Act and thereby undermine its fundamental purpose. Such a situation could intimidate legitimately aggrieved plaintiffs while permitting unlawful discrimination to flourish. Accordingly, we adopt the following standard for awarding subsection 13–7–4(d) expenses in cases brought under the Act.

The district court may award prevailing defendants their actual and necessary expenses under subsection 13–7–4(d) only when it concludes that the plaintiff's action, even if brought in good faith, was frivolous, unreasonable, or without foundation.[11] In addition, a prevailing defendant may be awarded subsection 13–7–4(d) expenses upon a determination that the plaintiff continued to litigate a claim after it became clear that the claim was frivolous, unreasonable, or without foundation.[12] In making this assessment, we

---

**11.** We note that the standard we adopt today is, in application, quite similar to the sanctions standard we have previously incorporated into our rule 11 jurisprudence. *See* Utah R.Civ.P. 11; *Barnard v. Utah State Bar*, 857 P.2d 917, 919–21 (Utah 1993); *Barnard v. Sutliff*, 846 P.2d 1229, 1236 (Utah 1992).

> Rule 11 does not impose a duty to do perfect or exhaustive research. The appropriate standard is whether the research was objectively reasonable under all the circumstances.... Nor does rule 11 require the attorney to reach the correct legal position from the research. It is enough that the attorney's reading of the law is a reasonable one. Thus, once an attorney forms a reasonable opinion after conducting appropriate research, the mere fact that the attorney's view of the law was wrong cannot support a finding of a rule 11 violation.

*Sutliff*, 846 P.2d at 1236 (citations omitted). Similarly, section 13–7–4(d) does not impose a duty on civil rights plaintiffs or their attorneys to

perform perfect or exhaustive research or to reach the correct legal conclusion. It is enough that their efforts and reading of the law are reasonable.

**12.** Our conclusion is consistent with the federal civil rights standard and those of several of our sibling states. *See Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978) (holding that courts may award prevailing Title VII defendant attorney fees "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith," and fees also may be awarded if plaintiff continued to litigate after its action clearly became frivolous, unreasonable, or without foundation); *see also Sees v. KTUC, Inc.*, 714 P.2d 859, 862 (Ariz.Ct.App.1985) (applying *Christiansburg* standard to case brought under Arizona Civil Rights Act); *Sigurdson v. Isanti County*, 386 N.W.2d 715, 722–23 (Minn.1986) (adopt-

caution courts to resist the temptation to engage in post hoc reasoning. The fact that a civil rights defendant ultimately prevails does not conclusively establish that the plaintiff's claim was frivolous or without foundation. *See Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 421–22, 98 S.Ct. 694, 700–01, 54 L.Ed.2d 648 (1978) (cautioning against post hoc reasoning when making frivolousness determinations in Title VII cases).

■ Determining whether a civil rights plaintiff's claim is frivolous for subsection 13–7–4(d) purposes is a question of law. Because the relevant historical facts of this case are not in dispute, we need not remand for a ruling by the trial court but decide the issue ourselves. *See Flying Diamond Oil Corp. v. Newton Sheep Co.*, 776 P.2d 618, 622 (Utah 1989); *State v. Lovegren*, 798 P.2d 767, 771 n. 10 (Utah Ct.App.1990). Applying the standard to the instant case reveals that NAC was not entitled to its actual and necessary expenses under subsection 13–7–4(d).

Courts must bear in mind that the terms, policy, and purpose of the Act require that it be liberally construed. Plaintiffs with at least colorable claims of discrimination must not be forced to pay the defendants' expenses under subsection 13–7–4(d). Distinguishing between lawful discrimination based on an advertisement's religious content and invidious discrimination based on the religion of the prospective advertiser is a fine and conceptually difficult distinction, in addition to being a question of first impression under the Act. It was not frivolous or unreasonable for World Peace Movement to have concluded that NAC's conduct amounted to unlawful religious discrimination under the Act.

In sum, we hold that World Peace Movement has failed to allege an injury cognizable under the Act. The Act creates individual rights protecting persons from invidious discrimination on the basis of their membership in suspect classifications. The Act does not prohibit newspapers from discriminating on the basis of content, even if that content is religious in nature. Thus, we affirm the district court's order granting summary judgment in favor of NAC.

We further hold that a court may award a prevailing defendant expenses under subsection 13–7–4(d) for any proceeding or action initiated under section 13–7–4, whether conciliatory, criminal, or civil in nature. In addition, we hold that the phrase "all actual and necessary expenses incurred in defending such action," Utah Code Ann. § 13–7–4(d), includes an award of both attorney fees and court costs. However, a court may award these expenses only upon concluding that the plaintiff's action, even if brought in good faith, was frivolous, unreasonable, or without foundation. A court also may award expenses upon a determination that the plaintiff continued to litigate the claim after it had clearly become frivolous, unreasonable, or without foundation. Because we hold that World Peace Movement's religious discrimination suit was not frivolous as a matter of law, we vacate the district court's award of actual and necessary expenses to NAC.

ZIMMERMAN, C.J., and STEWART, Associate C.J., concur.

RUSSON, Justice, concurring in part and dissenting in part:

I concur in the majority opinion with the exception of section two. I write separately (1) to express my concern with the majority's determination that the term "expenses," as used in Utah Code Ann. § 13–7–4(d) (1992), includes attorney fees, and (2) to challenge the majority's creation of a "frivolousness" standard of review for the award of expenses under section 13–7–4(d).

In Utah, attorney fees are awardable only when authorized by statute or contract. *Baldwin v. Burton*, 850 P.2d 1188, 1198 (Utah 1993); *Dixie State Bank v. Bracken*, 764 P.2d 985, 988 (Utah 1988); *Turtle Management, Inc. v. Haggis Management, Inc.*, 645 P.2d 667, 671 (Utah 1982); *see also* 20

ing *Christiansburg* standard in cases brought under Minnesota Human Rights Act); *McCann v. Trustees, Dodson Sch. Dist.*, 249 Mont. 362, 816 P.2d 435, 436–37 (1991) (adopting *Christiansburg* standard in cases brought under Montana

Human Rights Act); *Payne v. American–Strevell, Inc.*, 65 Or.App. 265, 670 P.2d 1065, 1066 (1983) (adopting *Christiansburg* standard in civil rights cases brought under Oregon's version of Title VII).

Am.Jur.2d *Costs* § 72 (1965) (noting that at common law there is no right to recover attorney fees .from opponent absent statute, rule, or express agreement between parties). In the case at bar, the statute states that a prevailing defendant "may be awarded all actual and necessary *expenses* incurred in defending such action, as determined and approved by the court having jurisdiction." Utah Code Ann. § 13–7–4(d) (1992) (emphasis added). Because the statute does not specifically provide for attorney fees and the majority opinion has not adequately demonstrated why we should abandon the general view that expenses do not include attorney fees and broadly interpret the phrase "all actual and necessary expenses" to encompass them, I would not interpret section 13–7–4(d) to include attorney fees.

First, such an interpretation marks a clear break with ·well-settled precedent in which this court has affirmed the award of attorney fees only when such award has been based on specific words providing for them in either the statute or the contract in question. *See, e.g., Baldwin*, 850 P.2d at 1198–99 (awarding attorney fees under Utah Code Ann. § 78–27–56 (1992), which provides that in civil actions, "the court *shall award reasonable attorney's fees* to a prevailing party if the court determines that the action or defense to the action was without merit and not brought in good faith" (emphasis added)); *AAA Fencing Co. v. Raintree Dev. & Energy Co.*, 714 P.2d 289, 292–93 (Utah 1986) (awarding attorney fees under Utah Code Ann. § 38–1–18 (1988), which provides for the award of "a reasonable attorneys' fee" to the successful party in an action to enforce a mechanic's lien); *Petty Inv. Co. v. Miller*, 576 P.2d 883, 884 (Utah 1978) (same); *Palombi v. D & C Builders*, 22 Utah 2d 297, 300–01, 452 P.2d 325, 327–28 (1969) (same); *Dixie*, 764 P.2d at 988 (awarding attorney fees "only in accordance with the terms of the contract"); *Trayner v. Cushing*, 688 P.2d 856, 858 (Utah 1984) (same); *L & M Corp. v. Loader*, 688 P.2d 448, 450 (Utah 1984) (same); *Turtle Management*, 645 P.2d at 671 (same); *Stubbs v. Hemmert*, 567 P.2d 168, 171 (Utah 1977) (same). Moreover, we have consistently refused to affirm attorney fee awards to any extent greater than the parties have express-

ly provided for. *See, e.g., Cottonwood Mall Co. v. Sine*, 830 P.2d 266, 268–70 (Utah 1992) (limiting attorney fees awarded to three kinds of legal work specifically provided for in lease); *Utah Farm Prod. Credit Ass'n v. Cox*, 627 P.2d 62, 66 (Utah 1981) (distinguishing between fees which would be allowable under contract and those which would not); *Kidman v. White*, 14 Utah 2d 142, 144, 378 P.2d 898, 899 (1963) (disallowing attorney fees on basis of no express provision for such in contract).

Second, absent specific statutory language, we have not read the use of terms similar to expenses, such as "costs," to include an award of attorney fees. *See, e.g., Wallis v. Thomas*, 632 P.2d 39, 43 (Utah 1981) (awarding costs to plaintiff, but remanding for determination of attorney fees); *Cluff v. Culmer*, 556 P.2d 498, 499 (Utah 1976) (holding attorney fees not allowable as costs); *Alexander Dawson, Inc. v. Hydroponics, Inc.*, 535 P.2d 1251, 1251 (Utah 1975) (same); *see also Tholen v. Sandy City*, 849 P.2d 592, 595–96 (Utah Ct.App.) (holding that phrase "[c]osts of collection as approved by the governing body or required by law" in Utah Code Ann. § 17A–3–322 (1991) does not include award of attorney fees), *cert. denied*, 860 P.2d 943 (Utah 1993); *accord Hicks v. Lloyd's Gen. Ins. Agency, Inc.*, 763 P.2d 85, 86 (Okla.1988); *Lanes v. O'Brien*, 746 P.2d 1366, 1374 (Colo.Ct.App.1987). It follows that we should likewise interpret "expenses" to not include attorney fees. *See* 20 Am. Jur.2d *Costs* § 72 (1965) ("The term 'costs' or 'expenses' as used in a statute is not understood ordinarily to include attorneys' fees."). This is especially true in light of the fact that the legislature has time and time again used the term "attorney fees" to expressly authorize such an award and has also explicitly distinguished attorney fees from other costs and expenses of litigation. *See, e.g.,* Utah Code Ann. § 7–15–1(3)(c) (Supp. 1993) (person issuing bad check is liable for "all costs of collection, including all court costs and reasonable attorneys' fees"); Utah Code Ann. § 13–11–17.5 (1992) (specifically providing for attorney fees to prevailing enforcing authority under Utah Consumer Sales Practices Act); Utah Code Ann. § 38–

1–17 (1988) (subcontractor enforcing mechanic's lien shall have costs awarded "including ... reasonable attorney's fee"); Utah Code Ann. § 57-1-32 (1994) (specifically providing for attorney fees in action to recover balance due on obligation for which trust deed given as security); Utah Code Ann. § 76-10-1605(8) (Supp.1993) (allowing recovery of "reasonable expenses incurred because of the defense against [a racketeering claim], *including a reasonable attorney's fee*" (emphasis added)); Utah Code Ann. § 78-11-10 (1992) (specifically providing for counsel fees to prevailing party as allowed by court in action brought against law enforcement officer); Utah Code Ann. § 78-27-56(1) (1992) (when action is without merit and brought in bad faith, "court shall award reasonable attorney's fees to a prevailing party"); Utah Code Ann. § 78-27-56.5 (1992) (specifically providing for attorney fees at court's discretion in civil action when written contract so provides); Utah Code Ann. § 78-34-16 (1992) (specifically affording full reimbursement to condemnee "for all reasonable and necessary expenses actually incurred ... *including attorneys fees*" (emphasis added)); Utah Code Ann. § 78-34-19(2) (1992) (specifically allowing for "all reasonable and necessary expenses actually incurred by the condemnee *including attorney fees*" (emphasis added)). In view of the Utah legislature's practice of specifically using the term "attorney fees" when such an award is authorized, the lack of the express term "attorney fees" within section 13-7-4(d) is dispositive that the legislature did not intend an award of attorney fees under that section.

Third, Utah decisions have consistently treated "expenses" and "attorney fees" as distinct. This court has previously held:

> It is undoubtedly true that an attorney, by virtue of his employment, has implied authority to incur such *expenses* as may be reasonable, proper, and necessary to the conduct of his client's business; and if the attorney advances money for such costs, he is entitled to be reimbursed therefor, *separately and apart from his fee for services.*

*Skeen v. Peterson,* 113 Utah 483, 494, 196 P.2d 708, 713 (1948) (emphasis added); *see also Cabrera v. Cottrell,* 694 P.2d 622, 624 (Utah 1985) (refusing to allow an award of attorney fees *or* expenses); *Howe v. Professional Manivest, Inc.,* 829 P.2d 160, 165 (Utah Ct.App.) (concluding that "[Utah Rule of Civil Procedure] 54(d)(2) does not apply to expenses *or* attorney fees" (emphasis added)), *cert. denied,* 843 P.2d 1042 (Utah 1992).

The majority reasons that if attorney fees are not included, the available award of expenses would be limited to costs of a mere ten dollars and that would be inconsistent with the legislative history. However, either now or in the future, other recoverable expenses may be incurred in bringing an action under the act. Rather than strain the meaning of "expenses" to include attorney fees, it seems better policy to award attorney fees only when so specified by the legislature, court rule, or private agreement.

Lastly, to rule that courts can award attorney fees when not specifically authorized by statute, rule, or contract would allow for the award of attorney fees whenever a statute or contract provides for one side to pay expenses, even when such attorney fees were not contemplated. The majority opinion sets a dangerous precedent in this regard. Therefore, I do not join in the majority's opinion that the term "expenses" as used in section 13-7-4(d) includes attorney fees, but would hold that because that section does not specifically provide for an award of attorney fees, such award was improper here. For the reasons stated above, I concur in the majority's determination that the trial court improperly awarded attorney fees to defendant Newspaper Agency Corporation.

However, I dissent from the majority's opinion that court costs are likewise not awardable. Utah Code Ann. § 13-7-4(d) (1992) states:

> Any business establishment or place of public accommodation or enterprises regulated by the state charged with maintaining a public nuisance in violation of this act, which is determined or found not to be in violation of this act, may be awarded all actual and necessary expenses incurred in defending such action, as determined and approved by the court having jurisdiction of the matter.

Thus, under the plain language of this section,[1] the decision to award expenses rests with the discretion of the trial court. Expenses related to defending a cause of action clearly include court costs. *See, e.g., Copper Liquor, Inc. v. Adolph Coors Co.*, 684 F.2d 1087, 1098 (5th Cir.1982) (holding that "expenses" includes costs), *rev'd on other grounds, International Woodworkers of Am. v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir.1986); *In re Olliff*, 258 Ga. 157, 366 S.E.2d 289, 289 (1988) (holding that "expenses" refers to "costs"); *Head v. Savage, Minn.*, 255 N.W.2d 32, 38 (Minn.1977) (holding that "costs" and "expenses" are to considerable degree synonymous). Because the statute uses the permissive term "may," the trial court has considerable discretion is determining which expenses are "actual and necessary." *Cf. Canyon Country Store v. Bracey*, 781 P.2d 414, 420 (Utah 1989) (holding that use of word "may" in Utah Rule of Civil Procedure 49 indicates grant of discretion to trial court); *Nelson v. Trujillo*, 657 P.2d 730, 731 (Utah 1982) (applying same analysis to Utah Rule of Civil Procedure 59(a)(6)); *accord Boyle v. National Union Fire Ins. Co.*, 866 P.2d 595, 598 (Utah Ct. App.1993). Accordingly, this court should review the trial court's award of court costs for an abuse of discretion, not under a judicially legislated "frivolousness" standard. *See Canyon Country Store*, 781 P.2d at 420; *Nelson*, 657 P.2d at 731. Since the ten dollar filing fee awarded here was plainly essential to the defense of the law suit, it cannot be said that the award of such costs constituted an abuse of discretion. Therefore, I would affirm the award of the court costs in this case.

HOWE, J., concurs in the concurring and dissenting opinion of RUSSON, J.

1. The majority asserts that the language of section 13–7–4(d) is ambiguous as justification for launching into an unnecessary and questionable reading of that section's legislative history. I see nothing ambiguous in the language "[a]ny business ... which is found not to be in violation of this act, *may be awarded all actual and necessary expenses* incurred in defending such action, as determined ... by the court having jurisdiction of the matter." Utah Code Ann. § 13–7–4(d) (1992) (emphasis added).

Because the language of that section is plain and unambiguous, it is improper to "look beyond the same to divine legislative intent." *Brinkerhoff v. Forsyth*, 779 P.2d 685, 686 (Utah 1989); *accord Allisen v. American Legion Post No. 134*, 763 P.2d 806, 809 (Utah 1988).